[No. 28885. Department One. February 24, 1943.]

RICHEY & GILBERT COMPANY, *Respondent and Cross-appellant*, v. THE NORTHWESTERN NATURAL GAS CORPORATION *et al., Appellants*.[1]

[1]Reported in 134 P. (2d) 444.

*Snively & Bounds* and *Ryan, Askren & Mathewson,* for appellants.

*Cheney & Hutcheson,* for respondent and cross-appellant.

MALLERY, J.—The plaintiff, Richey & Gilbert Company, brought this action for damages to their building caused by a gas explosion, alleged to be due to the negligence of the defendants. Judgment was entered on the verdict of the jury in the amount of sixty-five hundred dollars. Defendants appeal and ask for a reversal of the judgment and for a new trial. Plaintiff cross-appeals from the denial by the court of a motion for an increased judgment notwithstanding the verdict of the jury. It does not ask for a new trial.

The building in question was owned by the respondent, Richey & Gilbert Company. It was situated near

the center of the Toppenish business district on land leased from the Northern Pacific Railway Company, under a long term lease, which included the alley across which the gas company's gas pipe extended, connecting the building with the larger gas mains. The building was bounded on the south by Toppenish avenue, the main street of the city, on the east by the main line of the Northern Pacific Railway, and on the west by the alley referred to. There were five stores or places of business situated in the front of the building on Toppenish avenue. The remainder of the building was used as a storage warehouse for farm produce.

In October, 1940, the owners and officers of the respondent, Richey & Gilbert Company, decided to grade the alley in connection with other work of converting a portion of the building from a warehouse to store purposes. They authorized Mr. J. M. Immel, their attorney in Toppenish, to ascertain from the city officials whether the alley could be graded as a WPA project. Although the city had done some small amount of work in the past in maintaining and grading the alley, the city officials denied the request, for the reason that the alley was on Northern Pacific property. They suggested also that the city did not have suitable equipment but that Yakima county did. Through the county engineer, Mr. Immel contracted orally to have the work done at Richey & Gilbert's expense by a county grader, operated by a county employee.

The county grader which was sent to do the work included a scarifier to break the hard packed surface. The scarifier had large teeth for this purpose, which could not, according to the testimony, penetrate to exceed six inches beneath the surface. Before much, if any, work had been accomplished, the teeth of the scarifier struck a buried pipe. It developed later that

this pipe was a two-inch main of the gas company's, and that the scarifier had pulled and bent the pipe, breaking the connection some distance away at the elbow where the service line entered the Richey & Gilbert building, permitting the gas to pass through the aperture, where the pipe had been pulled out of the foundation, allowing gas to spread around, in, and under the building.

The pipe was struck by the scarifier at about ten a. m. Not long after eleven a. m., one of the tenants of the building smelled gas and the gas company was called by phone and notified that there was a gas leak. The appellant gas company immediately sent over a service man, Roy Snyder. He had been supplied by the appellant company with an insulated safety flashlight for use in working around gas leaks. The expert testimony showed that proper practice requires the use of such special safety flashlight, the same being endorsed and recommended by the United States bureau of mines. However, he did not take this flashlight with him. He borrowed an ordinary flashlight from one of the tenants which was defective and could have ignited the gas.

Another tenant warned him that he had better be careful when he went down in the basement because the leak was apparently a "terribly bad one." Snyder merely nodded and entered the building. He opened the trap door to the basement, started to let himself down, turned on the borrowed flashlight, and instantly a terrific gas explosion occurred, killing seven people, severely injuring fourteen others, including himself, and destroying a large part of the building.

There were a number of spark or flame producing devices in the building which might have caused the explosion, particularly several electric motors with automatic switches.

636

Appellants contend that the trial court erred in permitting the jury to consider the question of whether or not the gas was ignited by the allegedly defective flashlight. There was ample expert testimony upon the subject, and the evidence that the flashlight ignited the gas, while not absolutely certain, was sufficient to warrant the submission of the question to the jury. *Briggs v. United Fruit & Produce, Inc.,* 11 Wn. (2d) 466, 119 P. (2d) 687; *St. Germain v. Potlatch Lbr. Co.,* 76 Wash. 102, 135 Pac. 804; *Senske v. Washington Gas & Electric Co.,* 165 Wash. 1, 4 P. (2d) 523.

We think this point is of slight importance, and in no event would constitute error, since it has been held to be unnecessary that the cause of the ignition in these circumstances be determined. 24 Am. Jur. 701, § 58; *Coffeyville Mining & Gas Co. v. Carter,* 65 Kan. 565, 70 Pac. 635; *Bradley v. Shreveport Gas Etc. Co.,* 142 La. 49, 76 So. 230; *McClure v. Hoopeston Gas & Electric Co.,* 303 Ill. 89, 135 N. E. 43, 25 A. L. R. 250.

It is contended that it was error for the court to allow the jury to consider the lack of a malodorant in the butane gas used by the company. It is clear that the gas as used had odor, but the evidence warranted the belief that had a malodorant been used, or sufficient of it, the leak might have been discovered quickly and the explosion prevented. The butane gas used had little odor. Appellants' own witness volunteered that no malodorant was used until after the explosion. It was not error to submit the question to the jury under proper instructions. The instructions must be presumed to have been correct, since appellants set none out in their brief to which exceptions were taken.

Respondent relies most strongly upon the negligence of the gas company in laying and maintaining its gas mains across the alley too close to the surface of the ground. In 1930, the city enacted an ordinance

granting the gas company's franchise, § 5 of which read:

"All pipe lines of the grantee shall be laid at least fifteen (15) inches below the surface of streets, alleys and avenues and at least such depth below the bottom of all drain ditches and in such manner as not to interfere with any present public or private drains, sewers, water mains, sidewalks, paving or other public improvements."

With reference to this section of the ordinance, the trial court instructed:

"You are instructed that a violation, if any, of the said requirements of the city ordinance of Toppenish is negligence, and if you find that there was such a violation thereof by the defendants and that the same was the proximate cause of the gas explosion in question, without any contributory negligence on the part of the plaintiff, then your verdict should be in favor of the plaintiff herein."

Appellants argue that the giving of this instruction was error (1) because the alley was not an "alley" within the meaning of the ordinance and franchise; (2) because the shallow depth at which the pipe was maintained was not the proximate cause of the explosion; and (3) because the court singled out the above quoted § 5 of the ordinance and refused to include § 8 of the ordinance and franchise hereinafter referred to.

■ Although situated upon Northern Pacific land leased to respondent, an examination of the evidence and the exhibits convinces us that this was a public alley. It is undisputed that the alley had been used continuously without restriction or interruption, not only by respondent, its tenants, and patrons, but by the public generally for over thirty years. For many years, it was the principal means of ingress and egress to and from the Washington Nursery Company, which

until 1931 conducted a very large nursery business a short distance north of the respondent's building. There is testimony that the alley was sometimes referred to as Ruby street, and a street sign had been placed on respondent's building at the intersection of the alley and Toppenish avenue. This alley connected at right angles with another alley, and so gave a through route from Toppenish avenue to Washington avenue, another prinicipal street of the city.

In these circumstances, it is well settled that this became and was a public alley either by (1) parol dedication or (2) by prescription and adverse user for over ten years. *Humphrey v. Krutz,* 77 Wash. 152, 137 Pac. 806.

However, even if the alley had been devoted to private use entirely, it was an alley within the meaning of the ordinance in 1931 when the gas main was laid, and had been for many years before that. Nor had the situation changed since 1931. A similar situation was before the court in the case of *Strohmaier v. Wisconsin Gas & Electric Co.,* 214 Wis. 564, 253 N. W. 798. In that case, the court held the gas company was liable, where the gas pipe in a private alley was struck by a mechanical trench digger which was being used in digging a trench for the purpose of laying a water main. Escaping gas caused an explosion. The court said:

"The defendant Gas Company claims that in any event it is only responsible for the results of breakage in the public streets or alleys; that it had not notice that the trench was to be dug or was being dug in the private alley; and that it owed no duty to the plaintiffs until it received such notice. But presumably the same likelihood of breakage of service pipes existed from digging in the public alley as from digging in the private alley. The duty, if such there was under the circumstances, was to use ordinary care towards protecting its patrons against injuries reasonably to be anticipated from the use of the trench machine,

wherever it might be working. The danger from that source was presumably the same whether the machine was used in one place or the other. Use of the means, if any, it was obligated to use to protect against injury from breakage in the public alley, would have been as effective towards preventing injury from breakage in the private alley as in the public."

The reason which called for the requirement that the pipe be buried at least fifteen inches below the surface applies with equal force whether or not there was any dedication to the public.

█ In claiming that the shallow depth of the pipe was not the proximate cause of the explosion, appellants contend that the striking of the pipe by the scarifier was an intervening cause rendering them not liable. The trial court concluded that the driver of the grader and scarifier, though an employee of Yakima county, was the agent of respondent in doing the work. With this we agree. It is true that neither he nor any representative of Richey & Gilbert Company made any but the most cursory inquiry as to whether there was a gas pipe or main across the alley. There was a map showing the gas mains in the gas company's office, which could have been examined, but none was filed with the city as required by the ordinance.

These contentions, we believe, are not sound, by reason of the fact that, even if the respondent did know, or should have known, that the building was serviced by the gas company and that the gas line extended across the alley in question, it still had a right to assume that the line would be buried at a sufficient and proper depth.

█ Before the grading was begun, and in order to grade the alley at all, it was found necessary to remove a large concrete foundation for what had formerly been a weighing scale. In doing this, the workmen exposed three pipes, one of which was later identified as

the gas pipe. Respondent's attorney, who was making the arrangements for the grading, saw these pipes, and it is argued that he should have warned the driver of the grader of their presence. It appears, however, that the gas pipe passed through the scale foundation and was buried at that place at a proper depth below the surface of the ground, estimated fifteen to eighteen inches. The other two pipes were apparently identified as a sewer pipe and a water pipe. There is nothing about the exposure of the three pipes which should have placed respondent upon notice that they would be closer to the surface elsewhere than at the place of exposure. The alley was very nearly flat, and the plan called for no grading which would have cut any considerably deeper than the scarifier cut in this one swipe.

There is considerable evidence from which the jury could have found that the depth of the pipe below the surface was from three to six inches, where it was struck. The jury was entitled to find that the laying, as well as the maintenance, of a two-inch gas pipe at such a place, and at such a depth, was negligence.

We have no doubt that the requirement of a depth of at least fifteen inches was regulatory in purpose. This court has held uniformly with the courts of other states that

"Illuminating gas is a dangerous thing when it is not under control, and it is incumbent upon those who deal in it as an article of merchandise to use care commensurate with its harmful nature." *Senske v. Washington Gas & Electric Co.*, 165 Wash. 1, 4 P. (2d) 523.

There is no doubt also that the maintenance of the pipe was a continuing negligence. The language used by the supreme court of California in the case of *Rauch v. Southern Cal. Gas Co.*, 96 Cal. App. 250, 273 Pac. 1111, is particularly apt upon this point. That was a suit by a property owner against a gas company

at Glendale, California, to recover for destruction of plaintiff's building in a gas explosion. The city ordinance required the pipe to be two feet deep, but it was actually only eighteen or twenty inches deep. A third party, while excavating a trench for the city along a street, with a mechanical excavator, struck and dented the pipe, causing a gas leak, and the escaping gas became ignited and exploded. The court affirmed judgment for plaintiff and held the defendant gas company negligent in failing to lay the pipe at a sufficient depth, saying:

"It is a general rule of the law of negligence that a violation of a statute, or a county or municipal ordinance which directly causes injury to another, constitutes negligence as a matter of law. (19 Cal. Jur. 632.) But, it is claimed by the appellant, and it appears to be the contention mainly relied on by it for a reversal, that the act of the defendant Huth in striking the service pipe, thereby causing its disconnection and consequent escape of the gas therefrom, was the independent, intervening act of a third person. Thompson, in his Commentaries on the Law of Negligence, volume 8, page 21, says: 'An efficient intervening cause within the meaning of the principles here involved is a new proximate cause which breaks the connection with the original cause and becomes itself solely responsible for the result. One of the most valuable tests to apply to determine this question is to determine whether a responsible human agency has intervened *sufficient of itself to stand as the cause.'* And, at page 20, same volume, he further says: 'An intervening agency which merely concurs with the cause counted on as a proximate cause of the accident does not prevent the latter from becoming the proximate cause for the purposes of the action.'

"By the failure of appellant to comply with the ordinances of the said city of Glendale in placing and maintaining its said service pipe beneath said streets, it was guilty of a continuing negligence, and such negligence continued to exist up to the time of the accident.

Had the negligent act of appellant ceased to exist prior to the striking of said service pipe by Huth, there would be foundation for the claim of appellant that the act of Huth in striking said pipe was the independent intervening act of a third person.

"It is the well-established law that the original wrongful act may be so continuous that the act of a third person precipitating the disaster will, in law, be regarded not as independent, but as conjoining with the original act to produce the accident [Citing cases].

"It is a matter of common knowledge that trenches are constantly being dug and excavations made in and under the public streets of cities. Therefore, where, as in this case, no record is kept or plat or map made or filed, showing the exact location of appellant's service pipes, *it should have anticipated in the ordinary and usual course of human conduct, the very thing that happened in this case was likely to happen.*" (Italics ours.)

Appellants assign as error the failure of the trial court to include § 8 of the ordinance and franchise with the quoted § 5 which required the pipes to be at least fifteen inches below the surface. The pertinent part of § 8 reads as follows:

"Section 8. The grantee shall at all times during the term of the franchise, install and maintain at his own expense, service devices and street service and all measuring and regulating devices and street services and all measuring and regulating devices, exclusive of meters, which may be necessary for the supplying of the service to the consumer, (including services to the curb line along the line of the main where the said main is in the street, and to the property line where the main is in the alley) and shall make all reasonable extensions for the supplying of its service to the consumers and inhabitants of the said city."

Appellants contend that § 8 is a limitation on § 5, and, inasmuch as the property line was some distance west of the area being graded, § 5 had no application. It appears clear to us, however, that the two sections

were enacted for different purposes. Section 5 was a safety measure; § 8 was not. Furthermore, the gas company had always assumed control over its main in the alley and in the building. The assignment of error must fail.

 Appellant Erik H. Nelson for a number of years had been trustee for the bondholders and mortgagee in possession of the gas company. He is sued herein in these capacities as well as personally. Affidavits were filed, asking for a stay of proceedings under the soldiers' and sailors' relief act of 1940, 50 U. S. C. A. (Sup.), § 510 *et seq.*, it appearing that, before the trial, or at least immediately after its commencement, Erik H. Nelson entered the active military service of the United States and could not attend the trial. Error is assigned upon the court's denial of the motion for a stay. The trial court is granted the discretion under the act to determine whether the defendant's military service materially affected his ability to conduct his defense. The court considered this motion before the trial in a most thorough manner and said in an extended memorandum opinion:

"He was not present in Toppenish on said date, nor had he then or previously been in active personal charge of the said gas distributing system. Such active management had been in charge of a local manager at Toppenish, an employee of the said Nelson and/or the Northwestern Natural Gas Corporation. It likewise appears that on and prior to November 28, 1940, said Nelson resided in the City of Seattle and that his visits to Toppenish were only occasional, infrequent and of short duration. His answers to written interrogatories propounded to him in the Carr case indicate that he had and has no personal knowledge of the conditions leading up to and the cause of the explosion.

"It seems apparent to the court, therefore, that the presence of the defendant Nelson at the trial of any

one of these actions is not essential to a proper conduct of his defense."

It furthermore developed from the affidavit and counter affidavits submitted that Erik H. Nelson carried one hundred thousand dollars of liability insurance as protection against accidents such as this one. Counsel for defendant contended that the probable result of compelling the case to go to trial in the absence of Nelson would operate to deprive him of the benefit of the insurance in his favor because, it was claimed, the insurance policy required the assured to assist the insurer in every way in the defense of actions "and to be present in court." With regard to this, the trial court stated:

"The insurance policy has not been produced and the court does not know whether or not it contains such a provision as stated in the argument of counsel. It suffices to say, however, that if it should appear during the progress of the trial, or at any other stage of the proceedings, that the assured's personal presence in court is necessary in order to protect him against a cancellation of his insurance coverage, the court would have no hesitancy in immediately granting a stay of proceedings until his personal presence could be assured."

No further mention of the insurance policy or its effect appears to have been made.

Respondent's attorneys offered to agree and did agree that appellants' attorneys could file their own affidavits stating what Erik H. Nelson would testify to, and agreed that he would be deemed to have so testified, and that the affidavits could be read to the jury. The affidavits were prepared and filed and were read to the jury at the trial. Respondent further agreed that no judgment recovered would be enforced against Nelson personally or any of his property, but only against his insurance.

The court, in cases such as this one, is obliged, at the outset, to visualize the trial and the preparation of it, with a view to determining the effect of the defendant's absence. It must be ready at any stage of the proceedings to change its decision and grant the stay if good reason therefor appears. Such was the attitude of the trial court in this instance. Without reviewing the entire matter, it is sufficient to say that, after a reading of the record, it cannot be said that the trial court abused its discretion in denying the motion for a stay of the proceedings.

The judgment must be affirmed as to the appellants.

The cross-appeal of respondent, Richey & Gilbert Company, does not ask for a new trial. Error is assigned because the trial court refused to enter judgment in the amount of twenty-six thousand five hundred dollars, the sum sued for, contended to be within a few hundred dollars of the least amount any witnesses testified to as to damages. Appellants introduced no evidence upon the subject of damages and satisfied themselves with cross-examination of respondent's witnesses.

The jury returned a verdict for the respondent in the sum of sixty-five hundred dollars. The respondent moved the court that judgment should be entered in "the sum established by the uncontradicted evidence, which is not less than $20,000 notwithstanding the verdict of the jury in the sum of $6,500." The trial court considered this motion in a comprehensive memorandum decision, denied the motion, and entered judgment upon the verdict of the jury.

As this question is presented upon a motion for judgment notwithstanding the verdict of the jury, it involves no element of judicial discretion. The rule is stated in *Haydon v. Bay City Fuel Co.*, 167 Wash. 212, 9 P. (2d) 98, in which the court said:

"The trial court is vested with the authority, and upon it is imposed the duty, of granting a motion for judgment notwithstanding the verdict when the evidence and all the inferences which the jury could justifiably draw therefrom would be insufficient to support a different finding."

The building, while thirty-seven years old, was a large one built of sandstone, and the most valuable part was destroyed. The monthly rentals received were in excess of two hundred dollars. The yearly rental paid the railroad company by the respondent was five hundred dollars, and it would remain at that figure until April, 1946. The lease and rental included in addition several small buildings to the south. A number of months at least would be required to reconstruct the building. Twelve hundred seventy dollars was spent on the part of the warehouse standing after the explosion, making it usable, and its value was depreciated considerably by the destruction of the other part.

Respondent produced five witnesses who testified as to the valuation of the building; two building contractors, an architect, its president, and its secretary. The lowest figure fixed by any of the witnesses was twenty thousand dollars as the value of the part destroyed, and a depreciation in value of five thousand dollars on the part damaged. The highest total fixed was approximately $32,553.

However, the trial was a long one, and, in the course of it, many bits of evidence were introduced, which the jury had the right to consider and which would tend toward enabling it to establish a much lower valuation than that fixed by the experts. The trial court mentioned some of these in his memorandum decision. He said:

"For instance, Mr. Elon Gilbert, president of the plaintiff, in his letter of July 20, 1940, to the Northern

Pacific Railway Company (Defendant's exhibit 85) stated, among other things, that 'if there are any questions please let me know as I have been rather worried about the fact that our Toppenish warehouse has been unprofitable.' Mr. Gilbert also testified that the middle section of the building had been unprofitable as a warehouse and that for that reason they lowered the floor, so that it would be available for use in connection with the businesses located in the front section. The testimony showed that the building was from thirty-five to thirty-seven years old at the time of the explosion. The testimony indicated that large portions of the middle and rear sections had been and were unrented.

"In addition, the testimony of the expert witnesses as to the value of the property was at best only their opinions on the subject. Here, there was no such thing as a definite market value at the time and place in question, as was the case in *McNamara v. Georgia Cotton Co.,* 73 S. E. 1092, *supra,* which is relied upon by plaintiff. There the point in issue was the market value of cotton at a particular place on a particular date, and the only testimony thereon was given by a buyer and seller of cotton, who had personal knowledge of that market.

"Mr. Fassett, the architect who testified as to the building values, frankly stated that his testimony in that regard could not be definite or certain. He said: 'No, you have to use your judgment on that thing. It depends entirely on how well the building has been kept, for what use it was to be used, whether it is functioning or not as that kind of a building. You have to use your judgment on it as to whether you think it has depreciated down to the extent that it is no longer of any value. We usually start in at ten per cent, and then we figure two and a half per cent a year for a certain length of time. Well, after ten years that method of depreciation is of no value because you have gone by the period when that is of any use.' Q. 'Then say thirty years, what would be your depreciation on that building?' A. 'I think I answered that by saying that we cannot use this so called rule of thumb about depreciation, two and a half or ten per cent after ten years or thirty years, so you have to use your

head on the thing.' Q. 'Use your head instead of figures?' A. 'Yes, that is right.' Q. 'Then did you figure depreciation for thirty-five years?' A. 'Well, I depreciated it not according to that method but so much per years.' Q. 'I don't care what method you used. Did you use any method?' A. 'Yes, I used a method, but there is no rule. As I say, you have got to use your judgment on it.' Q. 'You have to guess at it?' A. 'You might.' "

Respondent's witness, Lee Siglea, the second building contractor, testified upon direct examination that the "reasonable value of the portion of" the building destroyed was $27,550. At the close of his testimony on cross-examination, he testified upon the subject of the building's depreciation as follows:

"Q. No depreciation on anything else? A. Yes. Q. What is it on the whole? A. The whole works amounts to practically eighty cents on the dollar, thirty-seven years old. Q. You mean eighty per cent depreciation? A. Eighty cents on the hundred for thirty-seven years. Q. What was the original cost that you figured then? A. Thirty-nine— MR. HUTCHESON: (Interposing) Objected to as immaterial. THE COURT: I don't know whether it is or not. I do not understand this witness' testimony. MR. BOUNDS: I don't think anybody else does. THE COURT: If he started from a figure back in 1905 and then figured depreciation, and then arrived at the figure he gave in answer to your question, then I think your objection is well taken. MR. HUTCHESON: He has already stated that. THE COURT: I don't know whether he has or not. Bring that out more clearly, Mr. Bounds. MR. BOUNDS: Your Honor, I don't think we care to ask him any more questions. THE COURT: Any more examination of this witness? MR. HUTCHESON: No, that is all."

This matter was not clarified afterwards by either side.

There were other weaknesses and uncertainties in the evidence as to value and damages. Some

of the witnesses admitted lack of knowledge of factors necessary to fix value. In fact, it cannot seriously be contended that all of the factors are present by which the value of the building to the respondent or its damages can be determined by mere computation. Nor can it be shown by mere computation that the jury's verdict is incorrect.

Before the lower court, respondent contended that the lowest amount fixed by any witness, or by the testimony of any combination of the witnesses, was $24,730. Now, it contends for a slightly greater figure. Yet its motion stated "that plaintiff is entitled to judgment in at least the sum of $20,000." As pointed out by the trial court, "If a judgment of $20,000 would be proper, then the fixing of the valuation on the property and the amount of damages were questions of fact for the jury."

Respondent's witnesses did not testify as to market value. Their testimony was expert testimony and subject to the general rules governing the same.

As stated in 20 Am. Jur. 1059:

"There is generally speaking, no rule of law which requires controlling effect or influence to be given to, and the court and jury are not required to accept in the place of their own judgments, the opinion testimony of expert witnesses merely because of the special knowledge of the witnesses concerning the matters upon which they give their testimony. Expert opinions are not ordinarily conclusive in the sense that they must be accepted as true on the subject of their testimony, but are generally regarded as purely advisory in character; the jury may place whatever weight they choose upon such testimony and may reject it, if they find that it is inconsistent with the facts in the case or otherwise unreasonable. Generally speaking, no distinction is made in this regard between expert testimony and evidence of other character. Opinions of experts are to be considered, however, and to receive such weight as, in view of all the circumstances, reason-

ably attaches to them. Even in those instances where several competent experts concur in their opinion and no opposing expert evidence is offered, the jury are still bound to decide the issue upon their own fair judgment, assisted by the statements of the experts."

Perhaps, the proper rule upon the subject is nowhere better stated than by Mr. Justice Field, in delivering the opinion of the court in *Head v. Hargrave,* 105 U. S. 45, 26 L. Ed. 1028. That was an action to recover for legal services. The court said:

"To direct them to find the value of the services from the testimony of the experts alone, was to say to them that the issues should be determined by the opinions of the attorneys, and not by the exercise of their own judgment of the facts on which those opinions were given. The evidence of experts as to the value of professional services does not differ, in principle, from such evidence as to the value of labor in other departments of business, *or as to the value of property.* So far from laying aside their own general knowledge and ideas, the jury should have applied that knowledge and those ideas to the matters of fact in evidence in determining the weight to be given to the opinions expressed; and it was only in that way that they could arrive at a just conclusion. While they cannot act in any case upon particular facts material to its disposition resting in their private knowledge, but should be governed by the evidence adduced, they may, and to act intelligently they must, *judge of the weight and force of that evidence by their own general knowledge of the subject of inquiry.* And, while great weight should always be given to the opinions of those familiar with the subject, they are not to be blindly received, but are to be intelligently examined by the jury in the light of their own general knowledge; they should control only as they are to be found reasonable.

"The judgment of witnesses, as a matter of law, is in no case, to be substituted for that of the jurors." (Italics ours.)

See, also, *Forsyth v. Doolittle,* 120 U. S. 73, 30 L. Ed.

586, 7 S. Ct. 408, and *The Conqueror,* 166 U. S. 110, 41 L. Ed. 937, 17 S. Ct. 510.

 The facts in the case of *City Bond & Share, Inc. v. Klement,* 165 Wash. 408, 5 P. (2d) 523, were not identical with those in the instant case. However, the language used by the court in that case would apply here.

"If a general verdict is returned, and the amount which should have been found is a matter of *mere computation* and over which there is *no controversy,* the court may amend. But the court cannot, under the guise of amending a verdict, invade the province of the jury or substitute his verdict for theirs." (Italics ours.)

It may very well be that a larger verdict of the jury could have been sustained, still this court knows of no mathematical process by which it can compute away their verdict.

The judgment is affirmed as entered. Neither side will recover costs.

ROBINSON, MILLARD, STEINERT, and JEFFERS, JJ., concur.

---

May 5, 1943. Petition for rehearing denied.