[Nos. 4644–3–III; 4687–7–III; Division Three. February 17, 1983.] 4763–6–III.

NEW MEADOWS HOLDING COMPANY, ET AL, *Respondents,* v. WASHINGTON WATER POWER COMPANY, *Appellant.*

NEW MEADOWS HOLDING COMPANY, *Appellant,* v. WASHINGTON WATER POWER COMPANY, *Appellant,* PACIFIC NORTHWEST BELL, ET AL, *Respondents.*

*William J. Schroeder, Donald G. Stone,* and *Paine, Lowe, Coffin, Hamblen & Brooke,* for appellant Washington

Water Power Company.

*Fred O. Montoya, Edward A. Dawson,* and *Dawson & Meade,* for New Meadows Holding Company.

*Richard E. Hayes* and *MacGillivray & Jones,* for respondents Pacific Northwest Bell, et al.

*Thomas C. McKinnon* on behalf of Washington Natural Gas Company and *Karen Keeney* on behalf of American Gas Association, amici curiae for appellant Washington Water Power Company.

*Bryan P. Harnetiaux* and *Robert Whaley* on behalf of Washington Trial Lawyers Association, amici curiae.

MUNSON, A.C.J.—On December 31, 1978, Mark Brown sustained serious burns when the home he rented from New Meadows Holding Company and owner Harvey Raugust (New Meadows) was destroyed by a fire. The fire began when Mr. Brown attempted to light his oil stove and unknowingly ignited natural gas leaking into his home underground from a damaged gas line several blocks away. The gas leak was allegedly caused in 1971 when Cableway, Inc. (Cableway), laying underground telephone cable for Pacific Northwest Bell (PNB), damaged a 2–inch gas transmission line owned by Washington Water Power (WWP). Several lawsuits ensued.

1. New Meadows sued WWP, PNB and Cableway. WWP answered and sought indemnity by cross claim from PNB and Cableway. PNB brought separate summary judgment motions against New Meadows and WWP asserting that both the claim and cross claim were barred by the statutes of limitation in RCW 4.16.300–.320. New Meadows did not contest that motion; WWP did contest it. Both judgments were granted. New Meadows and WWP appealed.

2. Mr. Brown sued WWP. New Meadows joined with him and amended its complaint to add a strict liability count.

Both plaintiffs, New Meadows and Mr. Brown,[1] were granted summary judgment on the issue of strict liability. WWP sought discretionary review, which was granted. RAP 2.3(b). The appeals were placed on a parallel perfection schedule to be heard on the same day.

These appeals present two issues:

1. Whether New Meadows' claim and WWP's cross claim against PNB are barred by RCW 4.16.300–.320[2] because more than 6 years elapsed since the project was substantially completed.

2. Whether strict liability for abnormally dangerous activities should extend to natural gas companies for damages allegedly caused by a third party's interference with underground gas mains.

---

[1]New Meadows and Mark Brown did not join, however, in the action against PNB. At oral argument, PNB stated Mr. Brown's damage action against it is pending in the trial court. Mr. Brown has a cause of action therefore against PNB and WWP.

[2]RCW 4.16.300:

"RCW 4.16.300 through 4.16.320 shall apply to all claims or causes of action of any kind against any person, arising from such person having constructed, altered or repaired any improvement upon real property, or having performed or furnished any design, planning, surveying, architectural or construction or engineering services, or supervision or observation of construction, or administration of construction contracts for any construction, alteration or repair of any improvement upon real property."

RCW 4.16.310:

"All claims or causes of action as set forth in RCW 4.16.300 shall accrue, and the applicable statute of limitation shall begin to run only during the period within six years after substantial completion of construction, or during the period within six years after the termination of the services enumerated in RCW 4.16-.300, whichever is later. The phrase 'substantial completion of construction' shall mean the state of completion reached when an improvement upon real property may be used or occupied for its intended use. Any cause of action which has not accrued within six years after such substantial completion of construction, or within six years after such termination of services, whichever is later, shall be barred: *Provided,* That this limitation shall not be asserted as a defense by any owner, tenant or other person in possession and control of the improvement at the time such cause of action accrues."

RCW 4.16.320:

"Nothing in RCW 4.16.300 through 4.16.320 shall be construed as extending the period now permitted by law for bringing any kind of action."

## STATUTES OF LIMITATION

■ New Meadows did not contest PNB's motion for summary judgment; it has thus waived any claim it may have asserted against PNB.[3] *Curtis v. Seattle,* 97 Wn.2d 59, 639 P.2d 1370 (1982); *Shelton v. Farkas,* 30 Wn. App. 549, 635 P.2d 1109 (1981). This court will not consider arguments raised for the first time on appeal. The court's dismissal of New Meadows' action against PNB is affirmed.

The only remaining question on this issue is whether this statute of limitation bars WWP's cross claim for indemnity should WWP be found liable in maintaining its gas line.

The purpose for such legislation was succinctly stated in *Nevada Lakeshore Co. v. Diamond Elec., Inc.,* 89 Nev. 293, 295–96, 511 P.2d 113, 114 (1973):

> The apparent purpose of NRS 11.205 [parallel statute to RCW 4.16.300–.320] is to afford ultimate repose and protection from liability for persons engaged in the designing, planning and construction of improvements to realty. Without protection such persons would be subject to liability for many years after they had lost control over the improvement or its use or maintenance.

Our courts have construed these statutes to bar claims for negligent construction brought after the 6–year period. *Yakima Fruit & Cold Storage Co. v. Central Heating & Plumbing Co.,* 81 Wn.2d 528, 503 P.2d 108 (1972); *Rodriguez v. Niemeyer,* 23 Wn. App. 398, 595 P.2d 952 (1979).

■ WWP strenuously argues the construction statute of limitation does not apply to claims for damage to adjacent property and contends the proper statute of limitation is RCW 4.16.080(1).[4] WWP is correct. In *Vern J. Oja & Assocs. v. Washington Park Towers, Inc.,* 89 Wn.2d 72, 75–76, 569 P.2d 1141 (1977), the court stated:

---

[3]New Meadows and WWP took the position here that WWP represented New Meadows at the hearing. Without documentation showing WWP had standing to represent New Meadows' claims, this position is untenable.

[4]RCW 4.16.080(1) reads:

"Actions limited to three years. Within three years:

"(1) An action for waste or trespass upon real property; . . ."

In those cases involving damage to real property arising out of construction or activity on adjacent property, the cause of action accrues at the time the construction is completed if substantial damage has occurred at that time. If the damage has not occurred when the construction is completed, the action accrues when the first substantial injury is sustained thereafter.

Although WWP may have been substantially damaged when the gas line was struck (a question not answered here), New Meadows did not sustain damage until the fire occurred. New Meadows and Mr. Brown had no cause of action prior to the fire and should not be held to a statute of limitation designed to encompass only parties directly involved in the construction project. This reasoning is buttressed by *Gazija v. Nicholas Jerns Co.*, 86 Wn.2d 215, 543 P.2d 338 (1975), where the court stated only the infliction of actual and appreciable damages causes an action to accrue. *Gazija*'s logic clearly applies to this situation. Here the property was several blocks away from the underground gas line; damage to Mr. Brown and New Meadows did not result for 7 years. These parties had no notice of any potential risk, much less actual damage, until the fire occurred. The trial court erred in applying RCW 4.16.300–.320; the proper statute of limitation is RCW 4.16.080(1).

PNB's reliance on *Washington Natural Gas Co. v. Tyee Constr. Co.*, 26 Wn. App. 235, 611 P.2d 1378 (1980) is misplaced. There, the issue of damage to adjacent property was not raised. Instead, Washington Natural Gas Company argued RCW 4.16.300–.320 did not apply because laying cable was not an improvement upon real property. The court held that it was.[5] The facts there indicate Washing-

---

[5]In *Washington Natural Gas Co. v. Tyee Constr. Co., supra,* Tyee maintained its cables were the improvement and Tyee had ceased to possess and control the improvement 9 years earlier. Thus, the RCW 4.16.310 proviso—"this limitation shall not be asserted as a defense by any owner, . . . in possession and control of the improvement . . ."—did not apply. Here, PNB inconsistently asserts the telephone cable is the improvement for the purposes of the statute and the gas line is the improvement for the purposes of the proviso. Moreover, PNB is still in possession of the improvement by its use and control of the easement in conjunction

ton Natural Gas Company was aware of the construction and, had it used reasonable diligence, *Gazija v. Nicholas Jerns Co., supra,* it would have been aware of the damage much earlier than 9 years.

Moreover, *Washington Natural Gas Co.* is inapplicable because the present action did not arise from "any improvement upon real property." RCW 4.16.300. Neither the telephone cables nor the gas line were located upon New Meadows' property and therefore cannot be termed "betterments which are of a permanent nature and which add to the value of the property as real property." *Siegloch v. Iroquois Mining Co.,* 106 Wash. 632, 636, 181 P. 51 (1919). In *Washington Natural Gas Co. v. Tyee Constr. Co., supra,* the lines were laid in a housing subdivision, directly adding to the value of that land and enhancing its use. The record indicates New Meadows' home, located 2 blocks away from the gas main line and telephone cables, was heated by oil. Nothing in the record shows the lines involved here were in any manner affixed to New Meadows' realty. *See Yakima Fruit & Cold Storage Co. v. Central Heating & Plumbing Co., supra.*

## STRICT LIABILITY

WWP, joined by counsel for Washington Natural Gas Company (WNG) and the American Gas Association (AGA), as amici curiae, contend the trial court erred in holding them strictly liable[6] for damages caused by the gas

---

with WWP.

[6]W. Prosser, *Torts* § 75, at 494–95 (4th ed. 1971) states:

"This new policy [strict liability] frequently has found expression where the defendant's activity is unusual and abnormal in the community, and the danger which it threatens to others is unduly great—and particularly where the danger will be great even though the enterprise is conducted with every possible precaution. The basis of the liability is the defendant's intentional behavior in exposing those in his vicinity to such a risk. The conduct which is dealt with here occupies something of a middle ground. It is conduct which does not so far depart from social standards as to fall within the traditional boundaries of negligence—usually because the advantages which it offers to the defendant and to the community outweigh even the abnormal risk; but which is still so far socially unreasonable

leak. Present Washington law imposes a negligence standard. *Richey & Gilbert Co. v. Northwestern Natural Gas Corp.,* 16 Wn.2d 631, 134 P.2d 444 (1943); *Senske v. Washington Gas & Elec. Co.,* 165 Wash. 1, 4 P.2d 523 (1931).

■ The doctrine of strict liability for abnormally dangerous activities was adopted in Washington as long ago as *Patrick v. Smith,* 75 Wash. 407, 134 P. 1076 (1913) (vibration damage to adjacent buildings caused by blasting). In *Pacific Northwest Bell Tel. Co. v. Port of Seattle,* 80 Wn.2d 59, 491 P.2d 1037 (1971), the court adopted Restatement (Second) of Torts § 520 (1977), as a guide in deciding what activity should be considered abnormally dangerous. We follow that analysis here.

Section 520 states:

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

Comment *f* to section 520 states that all six factors are to be considered. While it is not necessary that all elements be present, ordinarily several are required for strict liability.

■ In the case at bar, several of the elements are present. Natural gas creates a high degree of risk and there is a likelihood of great harm should gas escape from gas lines.[7]

---

that the defendant is not allowed to carry it on without making good any actual harm which it does to his neighbors."

[7]The risk herein measured is the danger of escaping gas. The activity is the

In the context of these facts, however, the final four elements are missing. Comment *h* to section 520 points out the inability to eliminate risk means that unavoidable risk remains even after all reasonable care has been taken to control it. This is not true of natural gas. If reasonable care is taken, natural gas will remain in the lines constructed to carry it and explosions and fires will not occur. The AGA brief points out that stringent regulation of natural gas distribution has reduced deaths by accident to less than 25 per year nationwide. Compared to traffic fatalities on the highways (51,676 in 1980), this record is impressive.

Second, the activity—transmission of natural gas by underground lines—is a matter of common usage which is appropriate to the place where it is carried on. The AGA brief notes that:

> approximately 160 million people (or 70% of the total U.S. population) use pipeline gas for such residential needs as house or water heating, cooking and clothes drying. The natural gas industry provides about 35% of the total energy used by industry. Natural gas is also used by an estimated 3.4 million commercial establishments. . . .
> . . . Over 700,000 miles of distribution pipelines criss-cross communities in every state and the District of Columbia.

The transmission of natural gas by underground lines is a matter of common usage, is appropriate to the locale, and its value to the community outweighs its dangerous attributes. Therefore, natural gas transmission, while hazardous, is not an abnormally dangerous activity. Our research indicates no other jurisdiction has imposed strict liability for accidents arising out of gas transmission lines. *See* Annot., *Liability of Gas Company for Personal Injury or Property Damage Caused by Gas Escaping From Mains in Street,* 96 A.L.R.2d 1007 (1964), and cases cited therein. The rea-

---

transportation of gas by underground transmission pipes. Arguably, gas which escapes does not always present a high degree of risk nor will the harm always be great. For our analysis, however, the risk is great enough to require careful scrutiny of the activity.

soning of these cases parallels our own and is persuasive.

The cases relied on by New Meadows are not applicable. The facts of *Vern J. Oja & Assocs. v. Washington Park Towers, Inc., supra* (pile driving) and *Langan v. Valicopters, Inc.,* 88 Wn.2d 855, 567 P.2d 218 (1977) (aerial agricultural spraying) are distinguishable. To the extent *Siegler v. Kuhlman,* 81 Wn.2d 448, 502 P.2d 1181 (1972) applies strict liability for an abnormally dangerous activity,[8] the facts are entirely different. *Siegler v. Kuhlman, supra* at 459, contrasts the "quiet, relatively safe, routine procedure" of moving water underground described in *Pacific Northwest Bell Tel. Co. v. Port of Seattle, supra,* to "the extremely heightened activity" of transporting volatile gasoline down the freeway at high speed. *Siegler v. Kuhlman, supra* at 459. The facts here, although involving a gas product, fit the former description rather than the latter.

Further, *Siegler* was premised on the court's responsibility to see that justice is done. Because the fire had destroyed almost all of the evidence in *Siegler,* the plaintiffs were left without a remedy. Here, the cause of the fire is known and plaintiffs may seek damage under a negligence theory. Under these facts, there is no need to expand legal remedies.

PNB's summary judgment against New Meadows is affirmed. PNB's summary judgment on WWP's cross claim is reversed. New Meadows' summary judgment against WWP on the issue of strict liability is reversed and

---

[8] Four Justices from the 6–Justice majority stated they would not apply strict liability where the facts showed intervening causation. Restatement (Second) of Torts § 522 (1977) states that one carrying on an abnormally dangerous activity should not be absolved from liability even when there is an intervening force. The rationale is stated by comment *a* as:

> The reason for imposing strict liability upon those who carry on abnormally dangerous activities is that they have for their own purposes created a risk that is not a usual incident of the ordinary life of the community. If the risk ripens into injury, it is immaterial that the harm occurs through the unexpectable action of a human being, an animal or a force of nature.

It is therefore unclear whether the doctrine of strict liability for an abnormally dangerous activity really applies to the facts of *Siegler.*

remanded for trial on the negligence issue. If WWP is found negligent, it may seek indemnity from PNB.

GREEN, J., concurs.

GREEN, J. (concurring)—I have concurred in the majority opinion because in my view it accurately applies current decisional law. Moreover, it should be noted the courts of this state have not seen fit to impose strict liability upon electric transmission companies where there is a much higher incidence of injury than evidenced in the record here for the transmission of natural gas. *Scott v. Pacific Power & Light Co.,* 178 Wash. 647, 650, 35 P.2d 749 (1934); *Estate of Celiz v. PUD 1,* 30 Wn. App. 682, 685–86, 638 P.2d 588 (1981); *Amant v. Pacific Power & Light Co.,* 10 Wn. App. 785, 520 P.2d 181 (1974), *aff'd,* 84 Wn.2d 872, 529 P.2d 829 (1975). Consequently, current decisions do not support imposition of strict liability in this case.

McINTURFF, J. (dissenting)—The majority opinion says to me that if one is injured, killed, or suffers extensive property damage from an explosion while performing the common act of igniting one's oil stove (that explosion occurring because of the presence of escaped natural gas from an underground line), one has, under the law, the very difficult and expensive burden of proving the company which transmits that gas for profit, or a third party, was negligent. In 1983, this seems grossly unfair.[9]

Unless the victim was the wrongdoer, why shouldn't the one distributing the natural gas for profit pay the resulting damage, then recover from any third party wrongdoer, if those be the circumstances? Washington Water Power should be strictly liable for the damages to Mr. Brown and New Meadows. It should be incumbent upon Washington

---

[9] In 1943 and 1931, our Supreme Court held that the test for the liability of gas companies transmitting natural gas is that of negligence. *Richey & Gilbert Co. v. Northwestern Natural Gas Corp.,* 16 Wn.2d 631, 134 P.2d 444 (1943); *Senske v. Washington Gas & Elec. Co.,* 165 Wash. 1, 4 P.2d 523 (1931).

Water Power to collect back against Pacific Northwest Bell (PNB), as in a subrogation claim.

I realize there is no specific case law in the United States[10] holding the operators of natural gas transmission lines strictly liable for damages occurring as a consequence of explosions emanating from the gas escaping the confines of those lines. Nonetheless, this dissent offers legal, as well as commonsense, reasons our courts should look beyond yesterday and remove an outworn millstone from the necks of the innocent victims of faulty natural gas transmission lines.

### THE PHILOSOPHY OF RISK ALLOCATION

The choice presented here between the rules of negligence and strict liability is not new.[11] Over the years, proponents for each side have attempted to justify their respective positions by arguments that one legal theory is a more economically efficient tool of resource allocation than the other; one will better serve as a subsidy to spur technical or industrial development, or one is morally more acceptable than the other.[12] Regardless of the arguments posited, the touchstone of any loss allocation scheme must

---

[10]In Canada, it appears that strict liability may be a proper theory upon which to ground an action for injuries caused by natural gas escaping from a main. See *London Guar. & Acc. Co. v. Northwestern Utils. Ltd.*, [1935] 4 D.L.R. 737; *Raffan v. Canadian W. Nat. Gas, Light, Heat & Power Co.*, 8 W.W.R. 676 (1915); *Fenn v. Peterborough*, 73 D.L.R.3d 177 (1976). From 1915 to 1935, the appellate courts of Canada had grounded their strict liability approach on the basis of the natural gas companies' charters that contained language similar to that found in RCW 80.28.210: "every company shall construct and maintain such facilities [transporting natural gas by pipelines] as will be safe and efficient." Comment, *Liability of Natural Gas Transmission Line Operators: United States and Canadian Theories of Liability for Gas Transmission Line Accidents*, 3 Hastings Int'l & Comp. L. Rev. 455 (1980).

[11]In 1907, the Minnesota Supreme Court considered the choice question in *Gould v. Winona Gas Co.*, 100 Minn. 258, 111 N.W. 254 (1907), and decided in favor of negligence.

[12]*See, e.g.,* Epstein, *The Social Consequences of Common Law Rules*, 95 Harv. L. Rev. 1717 (1982); Coleman, *The Morality of Strict Tort Liability*, 18 Wm. & Mary L. Rev. 259 (1976).

be justice, *i.e.,* the fair balancing of benefits and losses between individuals as well as between individuals and society, as a composite of individuals.

Ordinarily, a fault–based tort system resting on rules of negligence places responsibility for the losses suffered by the accident victim upon the wrongdoer if his violation of an articulable duty has caused the accident. The justice of such an allocation is unquestionable. Likewise, when the victim's conduct has contributed to his injury, our scheme of comparative negligence attempts to mitigate the harshness of the loss allocation by apportioning the victim's loss between the victim and the wrongdoer on the basis of how much their respective conduct contributed to the loss. The justice of apportionment is patent.

What is unjust is when a victim must accept the full brunt of the loss because he cannot establish who the wrongdoer was or, if identified, what duty he violated.[13] Hence, the victim who is injured through no fault of his own bears the brunt of the loss. The instant case represents the injustice of what might be termed "the innocent victim's strict liability." I say this because unless the innocent victim, first, has the money to retain a lawyer and develop adequate proof in a complicated legal area, and second, proves that the negligence of the gas transmission company proximately caused the accident, the innocent victim is strictly liable for his damages. Isn't this strict liability in reverse—liability without fault of the victim?

During periods of technological or industrial advance which promise great societal benefits, theories of loss allocation which place the risk of serious loss upon the members of society for technological or industrial accidents not attributable to an identifiable person breaching an articula-

---

[13]*See Clift v. Nelson,* 25 Wn. App. 607, 608 P.2d 647 (1980). There, a policeman brought a civil action for assault and battery against 10 members of an unruly crowd at a tavern. Someone in the crowd had kicked the policeman in the back of his head while he was subduing an abusive patron. Because the plaintiff could not identify the person or persons who kicked him from the rear, he was unable to prove his case against a particular person or persons.

ble standard, may be acceptable for the well being of society and consequently, just. To hold otherwise places unreasonable restraints upon the development of society as a whole that ultimately would be adverse to the well being of its individual members. But once the promised benefits, such as here—the widespread use of a relatively clean and inexpensive energy source—have become a reality, the risk of serious loss should be spread among the beneficiaries of the advance and not thrust upon a faultless victim.

Just how prevalent are injuries and damage from natural gas explosions? The majority correctly states there are fewer than 25 deaths each year in the United States from this kind of malfunction. Six years ago 466 failures involving transmission and gathering lines were reported to the Department of Transportation. 10 U.S. Dep't of Transp., *Natural Gas Pipeline Safety Act Annual Report* (1977), at 3 n.1. So the possible liability of any natural gas transmission company is not at a level so high as to be economically prohibitive when measured against the cost of insurance to compensate persons injured, or payment for property damaged by a gas explosion. The loss would be spread among its customers.

In *Snyder v. Moncton Elec. & Gas Co.,* [1936] 2 D.L.R. 31, a father came home, went to bed, and later a natural gas explosion killed him and seriously injured his wife and child.[14] Consequently, it is not merely semantics when we state, though miscarriages on the part of natural gas companies are very infrequent, when a miscarriage does occur, it can be lethal.

When this country was being developed, when today was still in the future, and when industry was in its infancy struggling to acquire a foothold, it was understandable that the law would only grant judgment against those at fault—those who were at least negligent. Today, however, the natural gas industry is not struggling, it is thriving and

---

[14]Numerous other examples of serious consequences of natural gas explosions could be described.

expanding. In *Kind v. Seattle,* 50 Wn.2d 485, 488, 312 P.2d 811 (1957), although not deciding the case on strict liability, the court quoted from *Bridgeman–Russell Co. v. Duluth,* 158 Minn. 509, 197 N.W. 971 (1924), in relation to a bursting water main, as follows:

> "If a break occurs in the reservoir itself, or in the principal mains, the flood may utterly ruin an individual financially. In such a case, even though the negligence be absent, natural justice would seem to demand that the enterprise, or what really is the same thing, *the whole community benefited by the enterprise, should stand the loss rather than the individual. It is too heavy a burden upon one.*

(Italics mine.) A convincing statement for the same theory is stated in 2 F. Harper & F. James, *Torts* § 14.3, at 794 (1956):

> When negligence is the sole basis for recovery of damage caused by the conduct of dangerous activities, it must necessarily be that in some cases innocent victims will go uncompensated. The individualistic philosophy of laissez faire sanctions this result on the theory that a person should not be held liable, no matter how innocent the victim, if he has done no "wrong." On the other hand, it is urged that the question is not one of "right or wrong" but who can best bear the loss—the person utilizing the ultrahazardous equipment or facility or the victim. The development of industry and business saw the rise of laissez faire as the dominant economic philosophy and fault as the dominant principle of liability for the casualties of enterprise, each being a ramification in its sphere of the individualism of the age. Fault is still no doubt the dominant principle of liability. *There is a growing belief, however, that in this mechanical age the victims of accidents can, as a class, ill afford to bear the loss; that the social consequences of uncompensated loss are of far greater importance than the amount of the loss itself; and that better results will come from distributing such losses among all the beneficiaries of the mechanical process than by letting compensation turn upon an inquiry into fault.*[16]

[16]See James, Accident Liability, Some Wartime Developments, 55 Yale L.J. 365 (1946). See also Feezer,

Capacity to Bear Loss as a Factor in the decision of Certain Types of Tort Cases, 78 U. Pa. L. Rev. 805 (1930), 79 id. 742 (1931); Takayanaye, Liability Without Fault in the Modern Civil and Common Law, 16 Ill. L. Rev. 163, 268 (1921), 17 id. 185, 416 (1923); Friedmann, Social Insurance and the Principles of Tort Liability, 2 Stan. L. Rev. 259 (1951); Comment, Loss Shifting and Quasi Negligence; A New Interpretation of the Palsgraf Case, 8 U. Chi. L. Rev. 729 (1941); Pound, The End of the Law as Developed in Legal Rules and Doctrines, 27 Harv. L. Rev. 195 (1914). For further treatment of risk-bearing capacity on this problem, see Morris, Hazardous Enterprises and Risk Bearing Capacity, 61 Yale L.J. 1172 (1952).

(Italics mine.)

### Strict Liability Applied

This all brings us to the determination of whether the transmission of natural gas is an abnormally dangerous activity within the strict liability provisions of Restatement (Second) of Torts § 519 (1977):

General Principle

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Section 520 states:

Abnormally Dangerous Activities

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is out-weighed by its dangerous attributes.

There are six factors to be considered under section 520 to determine whether section 519 should be applied. The first three factors deal with determining whether an activity is dangerous in itself, and the remainder concern application of section 519 to the activity determined to be dangerous.

The comments to Restatement (Second) of Torts § 520 state in part at page 37:

*f.* . . . In determining whether the danger is abnormal, the factors listed in Clauses (a) to (f) of this Section are all to be considered, and are all of importance. Any one of them is not necessarily sufficient of itself in a particular case, and ordinarily several of them will be required for strict liability. On the other hand, *it is not necessary that each of them be present, especially if others weigh heavily.* Because of the interplay of these various factors, it is not possible to reduce abnormally dangerous activities to any definition. *The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with all reasonable care.*

(Italics mine.)

In considering whether Restatement (Second) of Torts § 519 should apply, the majority admits the presence of factors (a) and (b) from Restatement (Second) of Torts § 520, *i.e.,* that the escape of natural gas from mains represents a high degree of risk and that the likelihood of harm therefrom will be great. Factor (c) is the inability to eliminate the risk by the exercise of ordinary care.[15] It is obvious to me that the risk of fire and explosion that inheres when natural gas escapes cannot be protected against or elimi-

---

[15]The comment on Restatement (Second) of Torts § 520(c) states in regard to "*Risk not eliminated by reasonable care*": "The utility of his conduct may be such that he is socially justified in proceeding with his activity, but the unavoidable risk of harm that is inherent in it requires that it be carried on at his peril, rather than at the expense of the innocent person who suffers harm as a result of it."

nated by the exercise of reasonable care. The question is not whether the escape of gas can be protected against or eliminated by the exercise of reasonable care, but whether the risk of fire and explosion after the escape of gas (because it will escape) can be eliminated by reasonable care. As long as we, as imperfect human beings, are responsible for the transmission of natural gas, accidents from the escape of that gas will continue to occur, as they have for decades in the past. Hence, there is no doubt that factor (c) is present.

The value of a dangerous activity may be such to a community that making the actor strictly liable for injuries flowing from the activity regardless of fault would not be appropriate because the community would lose the activity, to its detriment. To avoid the misuse of section 519, the last three criteria, (d), (e), and (f), focus a court's attention on the effect strict liability will have on the valuable activity. In particular, subsection (d) addresses whether the activity is a matter of common usage. If it is, then its value to the community is patent. Subsection (e) addresses whether the activity should be moved to another location or not. If it cannot, then strict liability could threaten the valuable activity. Subsection (f) addresses whether the value of the activity to the community makes the activity acceptable notwithstanding the dangerousness. If the answer to (f) is yes, then the valuable activity is going to continue unless the imposition of strict liability will make it economically unwise. Hence, when the court considers the three criteria, (d), (e) and (f), the imposition of strict liability to an abnormally dangerous valuable activity is warranted only if the activity will continue. Applying the three factors to the instant case, natural gas is here to stay regardless of strict liability. Therefore, the application of section 519 is appropriate.

The case of *McLane v. Northwest Natural Gas Co.*, 255 Or. 324, 467 P.2d 635 (1970) recognized the "irreducible minimum of risk" in the similar activity of blasting. In 255 Or. at 329, 467 P.2d at 638, it quoted the following from

Harper & James:

> "Moreover, while harm to others is neither certain, nor, in many cases, probable, if a high degree of caution and diligence is employed, still there is an irreducible minimum of risk involved even when all precautions are taken, and the possible harm is of such a serious nature that sound social policy demands that the actor assume the risk." 2 Harper and James, *The Law of Torts* 814, § 14.6 (1956).

In our state, *Siegler v. Kuhlman*, 81 Wn.2d 448, 502 P.2d 1181 (1972) discussed the dangers of gasoline by saying at page 454 that it was "dangerous in itself" and that "[g]asoline is always dangerous whether kept in large or small quantities because of its volatility, inflammability and explosiveness." Natural gas may be even more dangerous than gasoline because (a) it is not as containable, and (b) its presence can only be ascertained by smell, not sight. And *if* one recognizes the odor, it may be too late, because one is already encased in the explosive potential.

Later, the *Siegler* court conveyed at page 455 the philosophic approach that strict liability rests not only upon the ultimate idea of rectifying a wrong and putting the burden where it should belong as a matter of abstract justice, but also upon the maxim that where one of two innocent parties must suffer, the party which instigated or made the harm possible should be initially liable. In the instant case, obviously the natural gas transmission company made the loss possible by its ownership of and responsibility for the natural gas lines.

The question of third party interference as causation of the loss which troubled the majority in *Siegler* and troubles also my colleagues in the majority here can be solved by analogy to the field of insurance and the subrogation rights of the insurance company. Furthermore, this recognizes a proof problem that the majority in *Siegler* used as an alternative basis for its decision, *i.e.*, the strictly liable injuror is in the best position to know why and to prove

how the accident occurred, particularly in gas explosion cases.

## CONCLUSION

A natural gas transmission company serves society at a profit, which is good—not bad—but nonetheless a fact. When neither the company nor its customer is at fault, and an explosion kills or severely burns or injures the plaintiff or damages his property, we must again ask: Who is in the best position to make the innocent injured victim as whole as possible? The natural gas company should bear that burden because it can then be spread among its thousands of customers. The innocent injured person should not alone bear the weight of the burden. It is too heavy. Imposing the strict liability burden on the natural gas company is fair; it is humane. At a minimal cost per consumer, a neighbor can be returned, as much as possible, to his productive place in the community.

This is an opportunity to, in the words of the dissent in *Pacific Northwest Bell Tel. Co. v. Port of Seattle,* 80 Wn.2d 59, 68–69, 491 P.2d 1037 (1971):

> develop and to expand the law to fill an existing void as to legal remedies, and to meet a social need in a limited category of uniquely appropriate cases. . . .
>
> . . .
>
> I do not think it would open any Pandora's Box—certainly not to any alarming or objectionable extent—if strict liability were applied in the instant case.

I would hold the Washington Water Power Company strictly liable for the injuries caused Mr. Brown and New Meadows, but permit Washington Water Power to recover against Pacific Northwest Bell and its agent on a theory of negligence. Washington Water Power would be able to pass any unreimbursed liability on to each of its gas consumers.

Reconsideration denied April 18, 1983.

Review granted by Supreme Court July 22, 1983.