Steve C. Bubrick, Jr., and Mae E. Bubrick, Plaintiffs-Appellees, v. Northern Illinois Gas Company, a Corporation, Defendant-Appellant.

Gen. No. 53,067.

First District, Fourth Division.

September 23, 1970.

Joseph J. Jares, Jr. and Brunon J. Komosa, of Chicago, for appellant.

Nathan G. Brenner, Jr., Goldenson, Kiesler, Berman & Brenner, of Chicago (William Elman, Elman and Ehardt, of counsel), for appellees.

MR. PRESIDING JUSTICE STAMOS delivered the opinion of the court.

Plaintiffs brought an action for property damage to their home and personal belongings by the alleged negligence of defendant in causing a fire. Defendant appeals from a judgment in favor of plaintiffs, in the amount of $22,114.00. Defendant contends that the trial court committed prejudicial error by allowing certain instructions to be submitted to the jury, thus entitling defendant to a new trial.

Plaintiffs moved into their home in July, 1959, and remained in residence until January 24, 1961, when it was extensively damaged by fire. The fire originated in a small enclosure attached to the rear of the house. This enclosure was described as a shed, cubicle, cabinet or box and in appearance it was similar to a dog house. It was of wood construction, 4 feet high, 3½ to 4 feet long and 3½ feet in width with a concrete foundation.

This enclosure contained a water pipe, gas meter and regulator and an electrical switch that actuated the wa-

ter pump which was located in a well 75 to 80 feet from the house.

STEVE BUBRICK, testified on his own behalf:

He had only one occasion to enter this enclosure and that occurred in October, 1960, when he placed sawdust into it covering the water line coming out of the ground into the kitchen to prevent it from freezing. He did notice that in the spring grass did not grow near this enclosure. The weather, the evening and morning of the fire, was in the subzero temperatures and plaintiffs deliberately left the water running to keep the pipes from freezing.

On the morning of the fire, plaintiff awakened at 3:00 a. m. and noticed the house was filled with smoke. He awakened his wife and they fled the house. They did not smell any gas nor did they see any flames in the house, but when plaintiff went outside, he saw a light in the enclosure. He opened the door to the enclosure and saw flames pouring from underneath a gas pipe below the meter. The flame was bluish, 7 to 8 inches high and 1 to 1½ inches wide, and was coming through the sawdust which was now all ashes alongside the pipe. Plaintiff went to seek a hose, but by that time firemen had arrived at the scene. At this point in time, he heard an explosion and saw gas or fire coming out in spurts, making a trumpeting sound. The whole side of the house started to burn, and it was not until four hours later that the fire was extinguished.

Plaintiff left for work but returned in a few hours and noticed that the gas meter and approximately eight feet of defendant's underground gas pipe had been removed.

MRS. BUBRICK, plaintiff's wife, testified:

In 1960 she called defendant because of gas odors in her kitchen and they came and made adjustments to her range. On several occasions she believes she smelled gas inside their home.

FRED TELTZ, testified on behalf of plaintiff:

He was a member of the Lake Villa Fire Department and responded to a fire at plaintiff's home. Upon his

arrival, he observed the fire was intense at the area of the enclosure. The regulator was burning and defendant was summoned to shut off the flow of gas. A serviceman from defendant arrived within an hour and with the assistance of the firemen and their fog nozzle equipment, he was able to reach into the enclosure and shut the valve. The fire at the regulator then extinguished. The witness had no recollection of anyone removing any gas equipment and the last time he saw the regulator and gas meter was when he helped defendant's serviceman shut the valve which was located just below the regulator.

On cross-examination the witness related that he observed the flame 18 inches above the ground at the area where the regulator was located. There was no flame coming from the ground.

EDWARD C. McLEAN, testified on behalf of plaintiff:

He is an expert in the field of Industrial Engineering and in the design and construction of systems utilizing gas or electricity. He had occasion to examine fire damage to structures and machinery in the pursuance of his expertise. In response to a hypothetical question, this witness responded that in his opinion the initial source of fuel or combustible material which caused the fire was the gas coming out of the ground. The ignition of the gas was caused by the electric switch which energized the water pump in order to elevate the water pressure after it had been diminished by the constantly running water to prevent freezing. The source of fuel in the flames could only have come from the pipe carrying high pressure gas to the enclosure, rather than from any other source. There was another gas pipe in the enclosure leading from the gas meter to service the customer's appliances, which is the customer's pipe.

ELMER FRANK, testified on behalf of plaintiff:

He was a neighbor of plaintiff's and on the morning of the fire he saw a light of fire and then observed smoke coming from plaintiff's home. There were flames coming out of the enclosure and these flames seemed to be shooting "up like" from the ground.

JOSEPH W. LYNCH, was called as an adverse witness and testified:

He is manager of Maintenance and Construction for defendant and was operating superintendent at the time of the fire. He was in charge of the construction of gas mains, services, installing meters, regulators, maintenance of pressure and underground facilities and servicing of equipment.

Gas is purchased at 700 lbs. pressure per square inch and is reduced to 150 lbs. p.s.i. and thus forced into the mains. In the cities the pressure is reduced to between 20 to 60 lbs. p.s.i., where it is distributed in mains. The gas main near plaintiff's home was 60 lbs. p.s.i. and the line leading into their regulator was about the same. Defendant has records of the main but not the services. The company maintains records showing when the pipe was installed, but the witness did not remember when the gas service line was put in from the main to plaintiff's home; although he had looked at the records after the fire and the day he testified, he forgot the date of installation. Records of mapping of mains and dates of installation are at the Crystal Lake office. Practically every one of defendant's lines has anodes but this would depend on when the pipe was installed and ground conditions, because some soil is more corrosive to pipe than others. Defendant keeps a record of lines which have anodes and the record would show if the line to plaintiff's home was equipped with anodes.

The witness had never seen these records but believed they are also at Crystal Lake. The meters are read every month, or at least every two months, but the witness did not believe the records were kept after billing the customer. A record is maintained by defendant on service calls, but this witness did not know if there was a record of a service call from July, 1959, to January, 1961, regarding plaintiff's home. There was no service call for one year previous to the fire. A search of the records which are retained from a year to 18 months indicated there was no call at plaintiff's home. When asked as to the whereabouts of these records, this witness responded that they have either been destroyed or

would be at the Aurora office of defendant. He made no personal search but relied upon a clerk whose name he could not remember, so that the witness personally did not know if a service call had been made.

About 30,000 service calls a year are made by defendant. Defendant has a regular maintenance policy regarding its underground system and keeps a record of maintenance, but he did not know the last time the main near plaintiff's home was inspected. The lines are checked every five years and an instrument is used on the surface to detect underground leaks. A record of this practice is maintained and may be at Crystal Lake or in general storage at Aurora, but he had never seen it.

The first fitting on the gas pipe as it comes out of the ground is a valve. Above the valve is a regulator which reduces the pressure. At a reduced pressure the gas enters the meter and is measured before it flows into the customer's pipes and appliances. The gas was 60 lbs. p.s.i. before it reached the regulator and approximately $\frac{1}{4}$ of a pound p.s.i. after leaving it and entering the meter.

He was not present when the meter and regulator were removed, but the record of when it was done would probably be kept in general files in Aurora. The presence of a quantity of gas removes oxygen and this could cause vegetation to "brown out."

LLOYD SMITH, testified on behalf of defendant:

On the morning of the fire he was employed by defendant as an appliance serviceman and was directed to proceed to plaintiff's home,where there was a fire in progress. There was much smoke and the fire department was in attendance fighting the fire. The firemen assisted this witness so that he could reach into the enclosure to shut off the gas. He observed that flame was coming from or around the regulator that was extinguished when he closed the valve. No fire was observed emerging from the ground in the enclosure. He had no recollection of removing the regulator and meter, nor did a "meter removal order" in evidence refresh his recollection. Although his signature appeared on the removal order, he testified some other employee could have done it.

JOSEPH LYNCH, testified on behalf of defendant:

He interviewed plaintiff at his place of business on the day of the fire and plaintiff told him he saw the fire emerging from a circular plate, but did not say he observed it shooting up from the ground. A circular plate would mean he saw the regulator. In his opinion, the leaking gas was coming from a crack or break in plaintiff's gas pipe that led out of the meter. The meter and regulator were removed but the witness did not know which employee of defendant did it.

OPINION

█ The first instruction complained of by defendant is Illinois Pattern Instruction No. 5.01 which permits an unfavorable inference if a party, without reasonable excuse, fails to produce evidence under his control. Defendants contend that the records concerning installation, maintenance and inspection of its lines and equipment were not material under plaintiff's theory and that in any event, many of the records were unobtainable having since been destroyed.

Since these records pertain to the construction and maintenance of defendant's lines, allegedly the cause of the conflagration, we find these records to be particularly material to plaintiff's theory of the case. We also note that defendant's employee Lynch testified to checking some of these records after the conflagration. Therefore, even defendant attached sufficient interest in these records that warranted their examination demonstrating their materiality and relevancy.

Defendant in an endeavor to show a reasonable excuse for the absence or lack of records, introduced into evidence Illinois Commerce Commission regulations which provide for mandatory retention of records of general inspections, tests, meter repairs, customer services and reports of complaints for two-or three-year periods. However, these regulations do not prohibit the retention of records beyond the specified intervals. In light of the testimony of Lynch, we assume that some of these records were still available. However, defendant offers no reasonable explanation for their nonproduction. It is also difficult to discern which of the records were in existence and which had been destroyed.

Defendant cites Piechalak v. Liberty Trucking Co., 58 Ill App2d 289, 208 NE2d 379 (1965), wherein a minor plaintiff was struck down by defendant's truck as she ran across the street. There plaintiff subpoenaed the truck maintenance records of a year previous to the accident, but they were unavailable because they had been destroyed in the regular course of business. The court permitted plaintiff to comment on the unavailability of the records, but refused to give the instruction complained of in the case at bar.

In the case at bar, plaintiff pursued and was awarded a verdict on the theory that defendant's negligence in the maintenance and operation of its property caused the fire. In Piechalak, there was no suggestion that the condition of the truck caused or contributed to the accident and it was firmly established that the records in that case had been destroyed in the ordinary course of business.

Therefore, we find no error in submitting this instruction to the jury.

■ ■ Defendant next contends that Illinois Pattern Instruction No. 22.01, pertaining to the theory of res ipsa loquitur was erroneously given, because the enclosure was not in the sole control and management of defendant and that the fire could have occurred without any negligence on the part of defendant under the evidence.

Plaintiff at bar presented evidence that showed flames emerging from the location of defendant's pipe leading into the interior of the enclosure and thus, there was established an inference of general negligence on defendant's part that their instrumentality was defective.

Under that evidence, the pipe and equipment directly involved in the fire were the property of defendant and under its management and control are subject to inspections and regular visits by the meter reader. The fact that defendant's apparatus shared a common enclosure and location does not vitiate or diminish this control. In Metz v. Central Illinois Electric & Gas Co., 32 Ill2d 446, 450, 207 NE2d 305, the court held:

"The usual requirement that the accident-causing instrumentality must be under the exclusive control of the defendant doesn't mean actual physical control at the time of the accident, if the instrumentality or dangerous agency is one which it is defendant's responsibility to maintain at all times and which responsibility cannot be delegated by consent, agreement or usage."

See also Summers v. Northern Illinois Gas Co., 117 Ill App2d 125, 253 NE2d 881.

Therefore, we find no error in submitting the res ipsa loquitur instruction to the jury.

■■ The remaining two instructions complained of by defendant are not Illinois Pattern Instructions. The first reads as follows:

"If you find the plaintiffs were not guilty of any contributory negligence, and you find that gas was present on plaintiff's premises because of defendant's negligence as charged, and that this gas was the proximate cause of the damage complained of, although the immediate cause of the fire was ignition, the defendant is liable for damages resulting from the fire."

Defendant contends that this instruction is peremptory, directs a verdict in plaintiff's favor, and assumes the element of damages. We find this instruction advises the jury that if the gas leak was found by them to have been caused by the negligence of defendant, it was no defense on defendant's part to avoid liability by contending that the escaping gas would not have exploded and burned except for the spark caused by plaintiff's electric switch. If escaping gas is a proximate cause of the damage, the fact that the immediate cause of the fire is ignition is irrelevant. McClure v. Hoopeston Gas & Electric Co., 303 Ill 89, 99, 135 NE 43 (1922). There can be no reasonable denial that plaintiffs were damaged.

The other instruction advised the jury that:

"It was the duty of the defendant, before and at the time of the occurrence, to use reasonable pre-

caution in the furnishing of gas service and in the maintenance of its *pipes and equipment* to prevent the escape of gas upon plaintiff's premises." (Emphasis supplied.)

■ ■ Defendant complains that this instruction implies that a gas meter, valve or regulator was defective by the use of the word "equipment" and that this was prejudicial because there was no evidence in this regard.

This instruction recited the duty of defendant to avoid gas escaping onto plaintiff's premises and a further specific duty of maintaining its property to prevent the foregoing.

We also note that defendant in its special interrogatory to the jury, to which the jury responded affirmatively, asked:

"Was the defendant, Northern Illinois Gas Co., guilty of any negligence in the care and maintenance of its *piping and equipment* that proximately caused the damage complained of?" (Emphasis supplied.)

A party may not complain of an adversary's instruction when its own tendered instruction is subject to the same criticism. Cf. Prostko v. Willstead, 75 Ill App2d 477, 480, 220 NE2d 751; and Piechalak v. Liberty Trucking Co., 58 Ill App2d 289, 301, 208 NE2d 379. The same would be true in this case concerning defendant's tendered special interrogatory.

We do not perceive any implication that this instruction suggests to the jury that defendant's apparatus was defective.

We therefore affirm the judgment.

Judgment affirmed.

DRUCKER and ENGLISH, JJ., concur.