[No. 49588–2.   En Banc.   September 13, 1984.]

NEW MEADOWS HOLDING COMPANY, ET AL, *Petitioners,*
v. WASHINGTON WATER POWER COMPANY,
*Respondent.*

NEW MEADOWS HOLDING COMPANY, *Petitioner,* v.
WASHINGTON WATER POWER COMPANY, ET AL,
*Respondents.*

*Dawson & Meade, P.S.,* by *Edward A. Dawson,* for petitioners.

*Paine, Hamblen, Coffin & Brooke,* by *Donald G. Stone* and *William J. Schroeder,* for respondent Washington Water Power.

*MacGillivray & Jones, P.S.,* by *Richard E. Hayes,* for respondent Pacific Northwest Bell.

*Bryan P. Harnetiaux* and *Robert H. Whaley* on behalf of Washington Trial Lawyers Association, amici curiae for petitioners.

*David J. Muchow* and *Carol A. Smoots* on behalf of American Gas Association, amici curiae for respondents.

DOLLIVER, J.—Plaintiff Mark Brown, while attempting to light an oil stove on December 31, 1978, unwittingly ignited natural gas which was leaking from a damaged gas line several blocks away. The natural gas, unable to permeate the frozen ground, traveled laterally entering the drain field which serviced Brown's residence. The leak allegedly was caused 7 years earlier when Cable Way, Inc. (Cable Way), while laying underground telephone cable for Pacific Northwest Bell (PNB), damaged a 2–inch gas transmission line owned by Washington Water Power Company (WWP). The subsequent explosion seriously injured Brown and destroyed the residence he rented from New Meadows Holding Company (New Meadows).

Plaintiff New Meadows sued WWP, PNB, and Cable Way. WWP answered and sought indemnity by cross claim from PNB and Cable Way. PNB brought separate summary judgment motions for dismissal against New Meadows and WWP asserting the claim and cross claim were barred by the statutes of limitation in RCW 4.16.300–.320. New Meadows failed to appear and did not contest the motion. WWP appeared and resisted the motion. Both motions for dismissal were granted. New Meadows and WWP appealed.

Subsequently, Brown and New Meadows sued WWP alleging liability based upon negligence and strict liability. They then filed a motion for summary judgment against WWP on the issue of strict liability. This motion was granted.

Court of Appeals, Division Three, granted discretionary

review of the summary judgment order holding WWP strictly liable. This case and the appeals of New Meadows and WWP from the orders dismissing their actions against PNB were placed on a parallel perfection schedule and decided in a single opinion.

In *New Meadows Holding Co. v. Washington Water Power Co.,* 34 Wn. App. 25, 659 P.2d 1113 (1983), Division Three held RCW 4.16.300–.320 did not apply to claims for damages to adjacent property and therefore reversed PNB's summary judgment on WWP's cross claim. The court, however, affirmed PNB's summary judgment against New Meadows, finding its failure to contest the motion amounted to waiver. Additionally, the court held the transmission of natural gas through underground lines was not an abnormally dangerous activity. Therefore, the summary judgment against WWP on the issue of strict liability was reversed. Plaintiffs' petition for discretionary review was granted.

I

■ Initially, we must determine whether the failure of New Meadows to contest PNB's motion for summary judgment waived its right to appeal. Failure to raise an issue before the trial court generally precludes a party from raising it on appeal. *Smith v. Shannon,* 100 Wn.2d 26, 37, 666 P.2d 351 (1983). This rule affords the trial court an opportunity to rule correctly upon a matter before it can be presented on appeal. *Lake Air, Inc. v. Duffy,* 42 Wn.2d 478, 482, 256 P.2d 301 (1953). However, this rule does not apply when the question raised affects the right to maintain the action. *Maynard Inv. Co. v. McCann,* 77 Wn.2d 616, 621, 465 P.2d 657 (1970).

Since to deem New Meadows' failure to appear as a waiver affects its right to maintain the action, New Meadows' claim falls squarely under the exception to the general rule. Moreover, the trial court was not deprived of an opportunity to rule on the applicability of RCW 4.16.300–.320 to this case. PNB's motions for summary judgment,

based on these statutory provisions, were adequately briefed and argued by PNB and WWP. New Meadows and WWP had identical interests. Thus, New Meadows' argument was not raised for the first time on appeal. We reverse the lower court's summary judgment dismissal of New Meadows' claim.

## II

Next, at issue is whether New Meadows' claim and WWP's cross claim against PNB are barred by RCW 4.16-.300–.320. RCW 4.16.300–.320 apply to all claims or causes of action arising from construction, alteration, or repair of any improvement upon real property. RCW 4.16.310 states such claims

shall accrue, and the applicable statute of limitation shall begin to run only during the period within six years after substantial completion of construction . . . Any cause of action which has not accrued within six years . . . shall be barred: *Provided,* That this limitation shall not be asserted as a defense by any owner, tenant or other person in possession and control of the improvement at the time such cause of action accrues.

The Court of Appeals, relying on *Vern J. Oja & Assocs. v. Washington Park Towers, Inc.,* 89 Wn.2d 72, 569 P.2d 1141 (1977), held the statute did not apply to claims for damages to adjacent property. We disagree. *Oja* held, under the 3–year statute of limitation in RCW 4.16.080(1), the discovery rule determines when a cause of action accrues in cases involving damage to real property arising out of construction on adjacent property.

This holding has no impact on the absolute limitation on actions defined in RCW 4.16.310. *Gazija v. Nicholas Jerns Co.,* 86 Wn.2d 215, 222 n.2, 543 P.2d 338 (1975); *Hudesman v. Meriwether Leachman Assocs., Inc.,* 35 Wn. App. 318, 320–23, 666 P.2d 937 (1983). This statute begins to run upon substantial completion of a project, not upon the accrual of a claim. In fact, the statute runs against the accrual of any claim arising from the project. Consequently, for a claim to be heard, it must accrue within 6

years. Additionally, RCW 4.16.310 applies to *all* claims of causes of action arising from the activities covered. The focus is upon the cause of the damage, not its location. We conclude, therefore, the statute applies equally to claims arising from adjacent property.

The proviso of RCW 4.16.310, however, which prohibits an owner, tenant, or other person in possession and control of the improvement from asserting the limitation as a defense, removes PNB from the terms of the statute. PNB, as owner of the telephone cable, falls within the proviso. The claims of New Meadows and WWP are not barred by RCW 4.16.300–.320.

### III

Washington, as well as all other jurisdictions in the United States, applies a negligence standard to the underground piping of gas. *See Richey & Gilbert Co. v. Northwestern Natural Gas Corp.,* 16 Wn.2d 631, 134 P.2d 444 (1943); *Senske v. Washington Gas & Elec. Co.,* 165 Wash. 1, 4 P.2d 523 (1931); Annot., *Liability of Gas Company for Personal Injury or Property Damage Caused by Gas Escaping From Mains in Street,* 96 A.L.R.2d 1007 (1964 & Supp. 1983). Plaintiffs urge us to reexamine this doctrine and adopt the rule that the transmission of natural gas through underground lines is an abnormally dangerous activity upon which strict liability should be imposed.

■■ Strict liability is imposed when the conditions of Restatement (Second) of Torts §§ 519, 520 (1977) are met. *Pacific Northwest Bell Tel. Co. v. Port of Seattle,* 80 Wn.2d 59, 64, 491 P.2d 1037 (1971) (holding underground water mains do not constitute an abnormal condition warranting strict liability). Section 519 provides for the imposition of strict liability upon those who are carrying on an "abnormally dangerous activity". Whether an activity is abnormally dangerous is a question of law for the court to decide. *Langan v. Valicopters, Inc.,* 88 Wn.2d 855, 861, 567 P.2d 218 (1977).

Section 520 lists the factors to be considered when deter-

mining what constitutes an abnormally dangerous activity:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
> (b) likelihood that the harm that results from it will be great;
> (c) inability to eliminate the risk by the exercise of reasonable care;
> (d) extent to which the activity is not a matter of common usage;
> (e) inappropriateness of the activity to the place where it is carried on; and
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

An examination of these factors as they apply to the facts persuades us, as it did the Court of Appeals, that strict liability should not be imposed in this case.

It is conceded with regard to factors (a) and (b), that the volatile and highly explosive nature of natural gas potentially presents a high degree of risk of great harm. The invisibility of natural gas increases the risk of injury in that it decreases the likelihood escaping gas will be detected. As to factor (c), the phrase "the risk" plainly refers to the "high degree of risk" mentioned in factor (a). Thus, factor (c) addresses itself to the question of whether, through the exercise of ordinary care, the risk inherent in an activity can be reduced to the point where it can no longer be characterized as a "high degree of risk".

Some degree of risk of natural gas pipeline leaks will always be present. This does not mean, however, that the "high degree of risk" with which section 520 is concerned cannot be eliminated by the use of reasonable care with regard to the dangerous character of the commodity. *See, e.g., Fields v. Western Ky. Gas Co.,* 478 S.W.2d 20, 22–23 (Ky. 1972); *Bubrick v. Northern Ill. Gas Co.,* 130 Ill. App. 2d 99, 107–08, 264 N.E.2d 560 (1970). Gas companies are subject to strict federal and state safety regulations. 15 U.S.C. §§ 717, 719; 49 U.S.C. §§ 1671–1686; 49 C.F.R. § 192 (1983); WAC 480–93. Programs for corrosion control, pipeline testing, gas leak investigation, and awareness of con-

struction work near gas company facilities must be maintained. WAC 480–93–110, –170, –185, –190. Odorizers are placed in the gas itself to increase the likelihood of detection in those rare instances when natural gas does escape. In light of all this, we believe the high degree of risk involved in the transmission of natural gas through underground lines can be eliminated by the use of reasonable care and legislative safeguards.

Factors (d), (e), and (f) clearly weigh against imposition of strict liability. The underground transmission of gas is a matter of common usage which is appropriate to the place where it is carried on. In their brief, amici curiae on behalf of the American Gas Association estimate approximately 160 million people use gas for residential needs. About 35 percent of the total energy used by industry is provided by natural gas, United States Dep't of Energy Information Admin., *Monthly Energy Review* 23 (December 18, 1981); and 720,900 miles of distribution pipelines crisscross communities in every state and the District of Columbia, including 10,062 miles in Washington state. American Gas Ass'n, *Gas Facts, 1982 Data* 61, 63 (1983). Hence, it is entirely appropriate and necessary for communities to have gas lines placed underground.

New Meadows relies upon *Siegler v. Kuhlman,* 81 Wn.2d 448, 502 P.2d 1181 (1972), *cert. denied,* 411 U.S. 983 (1973) (strict liability imposed on hauling gasoline in commercial quantities as freight upon public highways). *Siegler,* however, is easily distinguishable. The court in *Siegler* stated:

> Stored in commercial quantities, gasoline has been recognized to be a substance of such dangerous characteristics that it invites a rule of strict liability—even where the hazard is contamination to underground water supply and not its more dangerous properties such as its explosiveness and flammability. It is even more appropriate, therefore, to apply this principle to the more highly hazardous act of transporting it as freight upon the freeways and public thoroughfares.

(Citation omitted.) *Siegler,* at 457. The underground transmission of natural gas presents a significant contrast to the

activity at issue in *Siegler*. Natural gas flows through a small (2–inch) pipe which is buried underground, away from the dangers of the surface world. There are no careless drivers, faulty brakes, or slippery roads with which to contend. The heightened danger resulting from the storage of a highly volatile substance in large commercial quantities, rolling at high speed on a well traveled highway, is also absent.

Furthermore, where there is the intervention of an "outside force beyond the control of the manufacturer, the owner, or the operator of the vehicle hauling [the gasoline]", the rule of strict liability should not apply. *Siegler*, at 460 (Rosellini, J., concurring). Here, the gas leak was allegedly caused when a contractor laying underground telephone cable for Pacific Northwest Bell damaged a 2–inch gas transmission line owned by defendant. Neither in its facts nor in its law does *Siegler* apply to this case.

We affirm the holding of the Court of Appeals that the transmission of natural gas through underground lines is not an "abnormally dangerous activity" upon which strict liability should be imposed, and reverse New Meadows' summary judgment against Washington Water Power on that issue. The case is remanded for trial on the issue of whether Washington Water Power exercised a degree of care commensurate to the danger involved in transmitting natural gas.

UTTER, BRACHTENBACH, and DIMMICK, JJ., and MORGAN, J. Pro Tem., concur.

PEARSON, J. (concurring)—I concur with the majority. Strict liability may not be imposed under the Restatement (Second) of Torts § 520 (1977) on the basis of factors (a) and (b) alone.

Regarding factor (c), I agree with the majority that it is not present in this case. However, even if factor (c) were present, I would not impose strict liability under section 520. Comment *h* to section 520 states, in pertinent part:

A combination of the factors stated in Clauses (a), (b) and (c), or sometimes any one of them alone, is commonly expressed by saying that the activity is "ultrahazardous," or "extra–hazardous." *Liability for abnormally dangerous activities is not, however, a matter of these three factors alone, and those stated in Clauses (d), (e), and (f) must still be taken into account.*

(Italics mine.) Thus, strict liability for abnormally dangerous activities may not be imposed absent the presence of at least one of the factors stated in clauses (d), (e) and (f). None of those three factors justify the imposition of strict liability in this case.

ROSELLINI, J. (dissenting)—The majority today departs from the analysis of strict liability contained in *Siegler v. Kuhlman,* 81 Wn.2d 448, 502 P.2d 1181 (1972), *cert. denied,* 411 U.S. 983 (1973). In so doing, the majority forecloses recovery to a seriously injured individual who—indisputably—bears no responsibility for the accident. With this result I cannot agree.

As pointed out by the majority, the Restatement (Second) of Torts § 520 (1977) sets out six factors to be considered. Section 520 states:

In determining whether an activity is abnormally dangerous, the following factors are to be considered:
(a) existence of a high degree of risk of some harm to the person, land or chattels of others;
(b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried on; and
(f) extent to which its value to the community is outweighed by its dangerous attributes.

Comment *f* to section 520 states that all six factors should be considered; while it is not necessary that all elements be present, ordinarily several are required for strict liability.

Here, the majority opinion acknowledges that the first two elements are present; natural gas creates a high degree of risk, and there is a likelihood of great harm should gas escape from gas lines. The majority holds, however, that the final four elements of section 520 are missing, and therefore strict liability should not be applied. The majority's analysis misapplies the Restatement section by ignoring the similarity between transportation of gasoline on the highway and the transport of natural gas, and rejects sound policy reasons for applying strict liability to the facts of this case.

To begin with, the majority misapplies section 520 of the Restatement by concluding that factor (c), the inability to eliminate the risk by the exercise of reasonable care, does not apply to the transport of natural gas. I believe it does.

The transmission of natural gas is analogous to the transportation of gasoline. Natural gas, like gasoline, remains relatively safe if contained in its proper place, *i.e.*, gas lines, storage tanks or even automobiles. Once natural gas or gasoline escapes, however, the exercise of ordinary or even extraordinary care frequently is incapable of averting an explosion. *See Siegler v. Kuhlman, supra.* In *Siegler,* we found this factor weighed heavily in favor of imposing strict liability. In the same way, the hazards associated with escaped natural gas demand imposition of strict liability.

The majority ignores this similarity by observing that the transport of natural gas involves no negligent drivers, slippery roads or faulty brakes. This distinction neglects the risks that may occur, such as negligent excavators, faulty digging equipment or vandals who may remove or damage warning signs.

Moreover, unlike the majority here, the court in *Siegler* did not feel compelled to slavishly total the number of factors in favor of imposition against those that did not. Instead, the court recognized the extreme hazard involved with the handling of this product and concluded sound policy dictated imposition of strict liability. In the same way, sound policy considerations dictate imposition of strict

liability here.

First, principles of risk allocation support the premise that between two innocent parties, the one benefiting from an activity should bear the risk of loss. Having received a benefit, that party is then in a position to spread the risk of loss to consumers of the products.

Furthermore, where the abnormally dangerous activity involves high risk of explosions, the one engaged in that activity has a better opportunity to determine the cause of the incident and can therefore seek indemnification. The injured plaintiff can prove negligence as to a third party only with great difficulty.

Finally, the imposition of strict liability here will spur the natural gas companies to greater safety precautions, such as periodic inspections and supervision of excavating activities within the vicinity of their lines.

For these reasons and those discussed above, I believe strict liability should be imposed. I therefore dissent.

WILLIAMS, C.J., and DORE, J., concur with ROSELLINI, J.