# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01499-COA

**EDITH DAVIS ELMORE**                                                         **APPELLANT**

**v.**

**DIXIE PIPELINE COMPANY**                                                      **APPELLEE**

DATE OF JUDGMENT:                  08/31/2015
TRIAL JUDGE:                       HON. LESTER F. WILLIAMSON JR.
COURT FROM WHICH APPEALED:         CLARKE COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:           JOHN W. CHRISTOPHER
                                   JAMES W. NOBLES JR.
ATTORNEYS FOR APPELLEE:            JAMES G. HOUSE III
                                   LAURA D. GOODSON
NATURE OF THE CASE:                CIVIL - PROPERTY DAMAGE
DISPOSITION:                       AFFIRMED: 10/03/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE GRIFFIS, P.J., FAIR AND GREENLEE, JJ.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1. Edith Davis Elmore appeals the exclusion of her expert witness and the entry of summary judgment on all asserted claims. Upon review, we find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Dixie Pipeline Company ("Dixie") operates a buried pipeline through which liquid propane is transported. The pipeline, which was constructed in 1961, extends approximately 1,100 miles from Texas to North Carolina, and includes various sizes of pipe. The particular segment at issue consists of a 395-mile stretch of 12-inch-diameter pipe, which runs from the west side of the Mississippi River near Erwinville, Louisiana, eastward to Opelika, Alabama,

and passes through Clarke County, Mississippi. Lone Star Steel Company manufactured the pipe using a low-frequency electric resistance welding (ERW) process.

¶3.     In 1988 and 1989, the Pipeline and Hazardous Materials Safety Administration (PHMSA) issued an alert notice to all hazardous-liquid-propane operators who had in place ERW pipe manufactured before 1970. The notices advised of operational failures of pipeline constructed with ERW pipe manufactured prior to 1970. The notices included certain recommendations by the PHMSA. Neither notice required pipeline operators to cease operating pre-1970 manufactured ERW pipe, or remove and replace the pipe.

¶4.     On November 1, 2007, the pipeline ruptured near Carmichael, Mississippi. As a result of the rupture, liquid propane was released, some of which vaporized and exploded. At the time of the explosion, Elmore owned a house located approximately 1.1 miles from the accident site. Elmore claims her house suffered structural damage as a result of the shockwaves from the explosion.

¶5.     The National Transportation Safety Board (NTSB) investigated the pipeline rupture. The NTSB noted that the pipeline segment at issue was hydrostatically pressure tested in 1961, and again in 1984.[1] Additionally, in-line inspections were subsequently performed in 1998, 2005, and 2006. Based on the inspections, the NTSB determined that no defects or anomalies in the subject pipe joint could be correlated with the 2007 rupture. The NTSB ultimately concluded that "the probable cause" of the subject pipeline rupture "was the failure of a weld that caused the pipe to fracture along the longitudinal seam weld, a portion

---

[1] In a hydrostatic pressure test, a pipe segment is filled with water at a specific pressure to test the strength and leak-resistance of the pipe.

of the upstream girth weld, and portions of the adjacent pipe joints." Importantly, the NTSB concluded that the following were not factors in the rupture: corrosion, excavation damage, the controller's actions, or the operating conditions of the pipeline.

¶6. In her amended complaint, Elmore asserted claims of negligence, strict liability, and punitive damages against Dixie, as the operator of the pipeline. Following the agreed-upon discovery deadline, Elmore filed a motion to direct Dixie to produce the transcript of the corporate deposition taken in a case that involved the same pipeline rupture, but was litigated in Texas.[2] The circuit court denied the untimely motion.

¶7. Dixie subsequently filed motions for summary judgment on all claims asserted by Elmore. The circuit court granted summary judgment in favor of Dixie on the strict-liability and punitive-damages claims, but denied the motion as to Elmore's negligence claim.

¶8. Dixie further filed a motion to exclude the opinions and testimony of Elmore's expert witness, Dr. Kendall Clarke. Following a hearing, the circuit court granted the motion, in part, and excluded Dr. Clarke from offering opinion testimony regarding the standard of care for pipeline operators, or any violation of that standard of care by Dixie.

¶9. Prior to trial, Dixie filed a renewed motion for summary judgment on Elmore's negligence claim. On reconsideration, and in light of the partial exclusion of Dr. Clarke's testimony, the circuit court granted summary judgment as to Elmore's negligence claim. Elmore now appeals and argues the circuit court erroneously: (1) denied her motion to

---

[2] The case, styled *Catherine Mitchell, individually, as Administratrix of the Estate of Mattie L. Mitchell, deceased et al. versus Enterprise Products Partners, L.P. and Dixie Pipeline Company*, was filed in the District Court of Harris County, Texas, 55th Judicial District, and arose from the same pipeline explosion.

produce the transcript of the corporate deposition taken in the Texas litigation, (2) excluded Dr. Clarke, (3) granted summary judgment on her strict-liability claim, (4) granted summary judgment as to her negligence claim, and (5) granted summary judgment on her punitive-damages claim.

ANALYSIS

I.     *The Denial of the Production of the Corporate-Deposition Transcript*

¶10.   Elmore first argues the circuit court erroneously denied her "motion to direct [Dixie] to produce the corporate deposition taken in the Texas litigation." "[Circuit] courts are afforded broad discretion in discovery matters, and this Court will not overturn a [circuit] court's decision unless there is an abuse of discretion." *Ashmore v. Miss. Authority on Educ. Television*, 148 So. 3d 977, 981 (¶9) (Miss. 2014).

¶11.   On February 27, 2014, an agreed order extending case-scheduling deadlines was entered by the circuit court, which extended the discovery-completion date to March 28, 2014. This was the second extension entered by the circuit court to allow the parties to complete discovery. On April 15, 2014, almost three weeks after the expiration of the agreed-upon discovery deadline, Elmore filed the subject motion and sought the production of "a true and correct copy of the deposition [transcript], with all exhibits, given by representatives of Dixie in the referenced Texas litigation."

¶12.   Prior to the agreed-upon discovery deadline, Elmore propounded written discovery to Dixie and deposed two corporate representatives of Dixie. At no time before the close of discovery did Elmore request Dixie to produce prior corporate depositions taken in Texas.

4

In fact, Elmore acknowledged that a formal request was not made until the filing of the motion at issue, which was after the expiration of the discovery deadline.

¶13.    The circuit court "has the authority and indeed the duty to maintain control of the docket and ensure the efficient disposal of court business." *Douglas v. Burley*, 134 So. 3d 692, 699 (¶20) (Miss. 2012) (emphasis omitted) (citing *Venton v. Beckham*, 845 So. 2d 676, 684 (¶25) (Miss. 2003)).  We find no abuse of discretion in the circuit court's denial of Elmore's untimely discovery motion.

## II.    The Exclusion of Dr. Clarke's Testimony

¶14.    Elmore next argues the circuit court erroneously excluded the opinions and testimony of her expert, Dr. Kendall Clarke.  "The standard of review for the admission or exclusion of expert testimony is abuse of discretion." *Patterson v. Tibbs*, 60 So. 3d 742, 748 (¶19) (Miss. 2011).  "This Court should find error in the [circuit] court's decision to exclude expert testimony only if the decision was arbitrary or clearly erroneous." *Id*.

¶15.    The circuit court excluded Dr. Clarke's opinion testimony regarding the standard of care of pipeline operators, and the alleged breach of that standard by Dixie.  Rule 702 of the Mississippi Rules of Evidence stated[3]:

> If scientific, technical or other specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is a product of reliable

---

[3] The Rules of Evidence were restyled in 2016 to make the rules clearer and easier to use without changing the substantive meaning. *See* Order Restyling the Mississippi Rules of Evidence (Miss. July 1, 2016).  Because the proceedings in this case preceded this change, we have quoted the former rule.

principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 589 (1993), the United States Supreme Court held that expert testimony must be relevant and reliable. Thus, "[w]hen determining whether expert testimony is admissible, our [circuit] judges should act as gatekeepers and must determine whether the proposed testimony meets the requirements of Rule 702 and *Daubert*'s relevance and reliability prongs." *Patterson*, 60 So. 3d at 749 (¶22).

¶16. Elmore retained Dr. Clarke, a metallurgical engineer, to offer expert opinions and testimony regarding Dixie's alleged negligence in its operation of the pipeline. In formulating his opinions, Dr. Clarke relied upon the NTSB report, the American Petroleum Institute (API) Standards, and the American Society of Mechanical Engineers Standards. Dr. Clarke did not rely upon the federal safety regulations, including 49 C.F.R. § 195 (2015), "Transportation of Hazardous Liquids by Pipeline."

¶17. Elmore acknowledges that Dr. Clarke's opinions did not include a violation of the federal regulations. However, Elmore asserts that Dr. Clarke was not required to base his opinions upon the federal regulations and to opine whether or not the federal regulations had been violated since her case was "based on common-law tort claims" and not on the federal statute. We disagree.

¶18. The Dixie pipeline became subject to the federal safety regulations for hazardous liquid pipelines, codified in 49 C.F.R. § 195, upon enactment in 1969 by the U.S. Department of Transportation. Under these regulations, propane is classified as a highly volatile liquid.

6

In his deposition, Dr. Clarke admitted that he had no familiarity with the federal regulations that govern integrity management for the pipeline. Additionally, Dr. Clarke admitted that he did not apply or consider those applicable federal regulations and standards in rendering his opinions in this matter. Instead, Dr. Clarke used "the API code because that applies in [his] business."

¶19. While the record indicates the pipeline was made of API-grade steel pipe and manufactured according to API standards, the pipe was not manufactured by Dixie. Instead, Dixie was the operator of the pipeline. The record shows the operation and maintenance of transmission pipelines is governed by federal safety regulations and standards. Indeed, the NTSB relied upon and cited 49 C.F.R. § 195 in its accident report.

¶20. Dr. Clarke, unlike the NTSB, never inspected the ruptured pipe joint, nor did he perform any testing or analysis on the ruptured pipeline segment. During his deposition, Dr. Clarke acknowledged that he had never been retained in any other case that involved a rupture in an interstate piping system that carried a highly volatile liquid. Dr. Clarke admitted that he had not "looked at a pipeline involving this type of stuff before" and further admitted that he had not "looked at a transportation pipeline governed by [the] DOT before this case." Moreover, Dr. Clarke testified that he had never before opined that a company failed to follow applicable standards or regulations for the integrity of its product.

¶21. Dr. Clarke opined the pipeline was running at too high a pressure, particularly given its age. However, the NTSB specifically determined that the operating conditions of the pipeline was not a factor in the rupture. Moreover, Dr. Clarke acknowledged that the

7

pipeline can run up to maximum operating pressure 24 hours a day, 7 days a week, 365 days a year. Although Dr. Clarke stated it was not a "good practice," he admitted that such a practice was allowed.

¶22. Additionally, Dr. Clarke opined that Dixie should have either removed from service every anomaly identified in the in-line inspections and replaced it with new pipe, or de-rated the pressure in the pipeline to a lower maximum operating pressure. When asked the basis of his opinions, Dr. Clarke did not cite to any federal regulation or standard. Instead, Dr. Clarke stated, "I believe it's fair to say this is my opinion at this point based on all of my training from my doctorate on up." However, the NTSB, which spent nearly two years investigating this accident, did not reach the same conclusions. In fact, the NTSB determined that no defects or anomalies in the subject pipe joint could be correlated with the 2007 rupture. Moreover, the corrective measures suggested by Dr. Clarke were not required under the federal regulations, nor would such measures have been warranted, as there was no evidence a rupture was imminent on November 1, 2007.

¶23. The circuit court found:

> The people [who are] using the pipe, they have got to use it according to the government reg[ulation]s because they are transporting interstate liquefied propane . . . . And there are government regulations that are in place to say this is what you have got to do to do it safely in accordance with the regulatory guidelines. And I'm not hearing . . . Dr. Clarke or anybody else to say that Dixie violated any of those standards. What you are saying is, well, he said that — API standards say that whoever manufactured the pipe should do something different. Well, the people that are telling Dixie how to safely manage their facility that transports interstate — items interstate, I'm not hearing them say that they violated any standard.
>
> Dr. Clarke, however, it doesn't seem to me that he can — I mean, unless he —

unless he states an opinion that relates to a violation of the applicable government regulatory standards, then I don't see how that applies to what you are dealing with.

I think [Dr. Clarke] is a qualified metallurgist, and he can be qualified to make an opinion or render an opinion as to what happened there that resulted in an explosion . . . .  I would allow him to testify about what happened in the pipeline that allowed the gas to escape . . . .  He can testify to that . . . .  As to violations of API standards[,] . . . I don't think that has any relevance.  I think the relevant issue is whether Dixie was operating their pipeline in accordance with regulatory guidelines, and he has not expressed any opinion about that.

¶24.   Since Dr. Clarke lacked familiarity with or understanding of the federal regulations and standards, the circuit court properly excluded his ability to opine as to the standard of care for pipeline operators or any violation of that standard of care by Dixie.  As the circuit court noted, testimony regarding the violations of API standards would be irrelevant and would not assist the trier of fact.  We find no error.

### III.   The Dismissal of Elmore's Strict-Liability Claim

¶25.   In her amended complaint, Elmore alleged that "[b]ecause of the inherently dangerous product being transported through its pipeline by [Dixie] with the potential for a devastating loss of property and/or life in the event of an explosion[,] [Dixie] is strictly liable for [Elmore's] damages."  Elmore's strict-liability claim is based on her assertion that the transportation of liquid propane is an ultrahazardous activity.  The circuit court noted that Mississippi has not declared such an activity ultrahazardous, and therefore found strict liability inapplicable.  Elmore now argues the circuit court erroneously granted summary judgment on her strict-liability claim.

¶26.   "We employ a de novo standard of review of a [circuit] court's grant or denial of

9

summary judgment and examine all the evidentiary matters before it." *Davis v. Hoss*, 869 So. 2d 397, 401 (¶10) (Miss. 2004). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). "The evidence is viewed in the light most favorable to the party opposing the motion." *Davis*, 869 So. 2d at 401 (¶10). However, "an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response . . . must set forth specific facts showing that there is a genuine issue for trial." M.R.C.P. 56(e).

¶27. In support of her claim, Elmore relies on *Donald v. Amoco Prod. Co.*, 735 So. 2d 161 (Miss. 1999). In *Donald*, the plaintiff purchased a twenty-acre parcel of property from the bank, which had seized the property at foreclosure. *Id*. at 164 (¶1). The former owners of the property were in the oil business and had allegedly transported oil-field waste to the property and disposed of it. *Id*. The plaintiff sued the bank and claimed it had negligently misrepresented the condition of the property. *Id*. at (¶2). The plaintiff further sued various oil companies for negligence, nuisance, trespass, breach of contract, waste, strict liability, and outrageous conduct. *Id*. The circuit court dismissed the strict-liability claim since oil-waste disposal was not considered an ultrahazardous condition. *Id*. at 171 (¶30).

¶28. On appeal, the Mississippi Supreme Court found that the plaintiff's strict-liability claim could be addressed without having to determine whether oil-waste disposal was an ultrahazardous activity since the plaintiff's nuisance, trespass, and strict-liability claims

"[were] not separate theories of liability." *Id*. at 172 (¶33). The Court explained that "a plaintiff may recover damage by a physical invasion of his property on a simple showing that the defendant was responsible for the physical invasion . . . regardless of whether [the plaintiff] categorizes his claim of physical invasion as nuisance or strict liability or trespass[.]" *Id*. at (¶¶33-34). Since the plaintiff "ha[d] alleged such a physical invasion for which the [o]il [d]efendants were responsible," the Court reversed the circuit court's dismissal of the plaintiff's strict-liability claim. *Id*. at (¶34).

¶29. We find Elmore's reliance on *Donald* is misplaced. Here, Elmore does not allege a physical invasion of her property, nor does she allege nuisance or trespass. Instead, Elmore's strict-liability claim is based solely on the fact that the transportation of liquid propane is an ultrahazardous activity. However, as noted in *Donald*, "strict liability for ultrahazardous activity has only been found . . . in cases involving explosives." *Id*. at 171 (¶30). The fact that liquid propane can ignite and become explosive does not mean activities that involve it are ultrahazardous for purposes of strict liability. *See Lewis v. Kinder Morgan Se. Terminals LLC*, Nos. 2:07cv47KS-MTP, 2:07cv48KS-MTP, 2008 WL 3540174, at *10 (S.D. Miss. Aug. 6, 2008) ("There is no evidence to suggest that the storage of gasoline . . . and the use of a loading rack to load and unload gasoline into tank trucks is an ultrahazardous [condition].").

¶30. In *Searle v. Suburban Propane,* 700 N.Y.S.2d 588, 589-90 (N.Y. App. Div. 2000), the plaintiff filed a products-liability action against the designer and installer of a custom propane-transmission system and sought damages for the death of the decedent killed in a

11

propane explosion following a pipe rupture. The trial court entered partial summary judgment in favor of the designer and installer on certain causes of action, including strict liability and res ipsa loquitur. *Id*. at 590. On appeal, the supreme court, appellate division, affirmed. *Id.* at 592.

¶31. Specifically, the appellate court found that "the installation and maintenance of a propane gas storage tank, transmission system and fixtures d[id] not constitute an ultrahazardous activity so as to impose absolute liability." *Id*. at 591. In determining whether an activity was ultrahazardous, the court considered the six factors set forth in the Restatement (Second) of Torts section 520, which are:

(a)     existence of a high degree of risk of some harm to the person, land[,] or chattels of others,

(b)     likelihood that the harm that results from it will be great,

(c)     inability to eliminate the risk by the exercise of reasonable care,

(d)     extent to which the activity is not a matter of common usage,

(e)     inappropriateness of the activity to the place it was carried on, and

(f)     extent to which its value to the community is outweighed by its dangerous attributes.

*Id*. The court ultimately concluded, "[i]n view of the widespread use of propane gas as a commercial, consumer and household product, and the reasonable precautions that can be taken to prevent explosion, we are not persuaded to label it as an ultrahazardous activity." *Id*.

¶32. Additionally, in *Melso v. Sun Pipe Line Co.,* 576 A.2d 999, 1003 (Pa. Super. Ct.

12

1990), a trial court found that the operation of a petroleum pipeline under a residential community was an abnormally dangerous activity so that Sun Pipe was subject to liability for harm, even if it took all reasonable care and the rupture was caused by the intervening act of a third party. The trial court determined that there was the potential that pipeline gasoline could cause an "environmental catastrophe of considerable magnitude" and "the pipeline transportation of large quantities of gasoline underneath a residential community is neither a matter of common usage, nor an activity appropriate to the place where it is carried on." *Id*.

¶33. On appeal, the Pennsylvania Superior Court reversed and found the transmission of natural gas and petroleum products by pipeline is "a common activity in a highly industrialized society such as our own." *Id*. The appellate court noted a jury instruction previously given, which stated:

> The measure of care is not that of an insurer to everyone who sustains loss by reason of gas escaping and exploding, but it is liable for an explosion where it knew or by the exercise of ordinary care should have known of the defect in its pipes or mains.

*Id.*

¶34. In *New Meadows Holding Co. v. Washington Water Power Co.*, 687 P.2d 212, 217 (Wash. 1984), the appellate court found that a gas company was not strictly liable for damages involving the transmission of natural gas through underground lines. The court examined the factors set forth in section 520 of the Restatement (Second) of Torts and conceded factors (a) and (b). *Id*. at 216.

¶35. With regard to factor (c), the court stated:

> Some degree of risk of natural gas pipeline leaks will always be present. This does not mean, however, that the "high degree of risk" with which section 520 is concerned cannot be eliminated by the use of reasonable care . . . . Gas companies are subject to strict federal and state safety regulations.

*Id*. Accordingly, the court found that "the transmission of natural gas through underground lines can be eliminated by the use of reasonable care and legislative safeguards." *Id*.

¶36.   The court found factors (d), (e), and (f) weighed against the imposition of strict liability. *Id*. Specifically, the court found "the transmission of gas is a matter of common usage, which is appropriate to the place where it is carried on." *Id*. The court further noted the widespread use of natural gas for residential needs. *Id*.

¶37.   Additionally, the court compared the underground transmission of natural gas to the hauling of gasoline in commercial quantities upon public highways. *Id*. at 216-17. The court stated:

> Natural gas flows through a small (2-inch) pipe which is buried underground, away from the dangers of the surface world. There are no careless drivers, faulty brakes, or slippery roads with which to contend. The heightened danger resulting from the storage of a highly volatile substance in large commercial quantities, rolling at high speed on a well traveled highway, is also absent.

*Id.* at 217.

¶38.   In *Kentucky Utilities Co. v. Auto Crane Co.*, 674 S.W.2d 15, 17 (Ky. Ct. App. 1983), the appellate court found the transmission of electricity was not an ultrahazardous activity for purposes of strict liability. The court noted that the transmission of electricity is a public necessity and stated, "the rules for strict liability for abnormally dangerous activities rarely apply to activities carried on in pursuance of a public duty." *Id*. at 18.

¶39.   Here, our analysis of the Restatement factors leads us to conclude that the

14

transportation of liquid propane is not an ultrahazardous activity for purposes of strict liability. As in *New Meadows Holding Co.*, 687 P.2d at 216, we too concede factors (a) and (b).

¶40. Regarding factor (c), Dr. Clarke opined Dixie's utilization of repeated pressure cycles and operating pressures caused the cracks to grow to critical length and depth. However, Dr. Clarke did not opine that the reduction of pressure cycles and operating pressures would reduce or eliminate the risk of a rupture. Importantly, the NTSB found that controller actions and operating conditions of the Dixie pipeline were not factors in the rupture. Moreover, the transportation of liquid propane is a regulated commercial activity, subject to state and federal regulations.

¶41. Additionally, factors (d), (e), and (f) weigh against the imposition of strict liability. The Dixie pipeline is a major pipeline through which liquid propane is transported from refineries in Texas, Louisiana, and Mississippi to customers all throughout the southeastern United States. The pipeline was built in 1961 and extends about 1,100 miles through multiple states from Texas to North Carolina. There is no evidence to suggest the placement of the pipeline was inappropriate. Moreover, the transportation of liquid propane is of great value to commerce and local, regional, and nationwide communities.

¶42. Overall, we find the transportation of liquid propane does not constitute an ultrahazardous activity. Accordingly, the circuit court did not err in dismissing Elmore's strict-liability claim on summary judgment.

    IV.    *The Dismissal of Elmore's Negligence Claim*

15

¶43.   To succeed on a claim for negligence, the plaintiff must show "(1) the existence of a duty 'to conform to a specific standard of conduct for the protection of others against the unreasonable risk of injury,' (2) a breach of that duty, (3) [a] causal relationship between the breach and [the] alleged injury, and (4) injury or damages." *Donald*, 735 So. 2d at 174 (¶42) (quoting *Meena v. Wilburn*, 603 So. 2d 866, 870 n.5 (Miss. 1992)). "Duty and breach of duty are essential to finding negligence and must be demonstrated first." *Id*.

¶44.   As previously noted, Elmore designated Dr. Clarke to offer expert testimony regarding the alleged negligence of Dixie. Dr. Clarke admitted that he has no familiarity with the federal regulations that govern integrity management for the Dixie pipeline. Thus, Dr. Clarke was not qualified to opine as to the applicable duty owed by pipeline operators or any breach of that duty by Dixie. Absent such evidence, there was no genuine issue of material fact to preclude summary judgment. Thus, Elmore's negligence claim fails.

¶45.   Elmore asserts "this is a proper case for [the] application of the negligence doctrine of res ipsa loquitur." "Res ipsa loquitur, literally translated 'the thing speaks for itself,' is simply one form of circumstantial evidence." *Gray v. BellSouth Telecomm., Inc.*, 11 So. 3d 1269, 1272 (¶11) (Miss. Ct. App. 2009). "Under the doctrine of res ipsa loquitur, negligence can be inferred in certain factual situations." *Id*. However, the doctrine should be applied cautiously." *Id*.

¶46.   To apply res ipsa loquitur, the plaintiff must prove three elements:

> First, the defendant must have control and management of the instrumentality causing the plaintiff's injury. Second, the injury must be such that in the ordinary course of things it would not occur if those in control of the instrumentality used proper care. Third and finally, res ipsa loquitur only

applies where the injury is not a result of the plaintiff's voluntary act. *Id*. at (¶12). We find Elmore failed to demonstrate the second element.

¶47. The second element requires Elmore to show "that in the ordinary course of things, the injury would not have happened if [Dixie] had used proper care." *Id*. at (¶13). Here, there is simply no evidence that in the ordinary course of things, the pipeline would not have ruptured had Dixie used proper care. The record shows Dixie complied with the governing federal regulations for the operation and management of interstate pipeline. The NTSB found no substantive violations by Dixie and specifically found that controller actions and operating conditions were not factors in the rupture. Thus, Elmore's claim that the pipeline ordinarily would not have ruptured had Dixie "used reasonable care and caution in the operation of the pipeline" is without merit.

¶48. As there were no genuine issues of material fact regarding both negligence and res ipsa loquitur, the circuit court properly dismissed Elmore's claim.

V.     *The Dismissal of Elmore's Punitive-Damages Claim*

¶49. Elmore last argues the circuit court "ha[d] no authority to grant summary judgment on the issue of punitive damages and committed reversible error in doing so." Since summary judgment was properly granted on Elmore's claims of strict liability and negligence, we decline to address the final issue of punitive damages, as the claim is moot.

CONCLUSION

¶50. Upon review, we find the circuit court did not abuse its discretion in denying Elmore's discovery motion or excluding Dr. Clarke. Additionally, as no genuine issues of material fact

17

exist, we find the circuit court's entry of summary judgment was proper on Elmore's claims

of strict liability and negligence.  Accordingly, we affirm.

¶51.    **AFFIRMED.**

      **IRVING, P.J., CARLTON, FAIR, WILSON AND GREENLEE, JJ., CONCUR. LEE, C.J., BARNES AND WESTBROOKS, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**